# COUNTY OF ONEIDA, NEW YORK, ET AL. *v.* ONEIDA INDIAN NATION OF NEW YORK STATE ET AL.

No. 83–1065.   Argued October 1, 1984—Decided March 4, 1985*

*Together with No. 83–1240, *New York* v. *Oneida Indian Nation of New York State et al.*, also on certiorari to the same court.

POWELL, J., delivered the opinion of the Court, in which BLACKMUN and O'CONNOR, JJ., joined, in all but Part V of which BRENNAN and MARSHALL, JJ., joined, and in Part V of which BURGER, C. J., and WHITE and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 254. STEVENS, J., filed a separate statement concurring in the judgment in part, *post*, p. 254, and an opinion dissenting in part, in which BURGER, C. J., and WHITE and REHNQUIST, JJ., joined, *post*, p. 255.

*Allan van Gestel* argued the cause for petitioners in No. 83–1065. With him on the briefs was *Jeffrey C. Bates.* Messrs. van Gestel and Bates also filed a brief for respondents County of Oneida et al. in No. 83–1240. *Peter H. Schiff,* Deputy Solicitor General of New York, argued the cause for petitioner in No. 83–1240. With him on the briefs were *Robert Abrams,* Attorney General, *Robert Hermann,* Solicitor General, and *Lew A. Millenbach,* Assistant Attorney General.

*Arlinda Locklear* argued the cause for respondents Oneida Indian Nation et al. in both cases. With her on the brief for respondents Oneida Indian Nation of Wisconsin et al. were *Richard Dauphinais, Francis Skenandore, Norman Dorsen,* and *Bertram Hirsch.* *Robert T. Coulter* filed a brief for respondent Oneida of the Thames Band Council.

*Edwin S. Kneedler* argued the cause for the United States as *amicus curiae* in support of the judgment below. With him on the brief were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne, Jacques B. Gelin,* and *Arthur E. Gowran.*†

---

†Briefs of *amici curiae* urging reversal were filed for C. H. Albright et al. by *J. D. Todd, Jr., Dan M. Byrd, Jr., John C. Christie, Jr., J. William Hayton, Stephen J. Landes,* and *Lucinda O. McConathy;* for the City of Escondido et al. by *John R. Schell, Kent H. Foster, Paul D. Engstrand,* and *Donald R. Lincoln;* and for the County of Seneca, New York, et al. by *James D. St. Clair, William F. Lee, David Millon,* and *James L. Quarles III.*

Briefs of *amici curiae* urging affirmance were filed for the American Land Title Association by *William T. Finley, Jr.;* and for the Association

JUSTICE POWELL delivered the opinion of the Court.*

These cases present the question whether three Tribes of the Oneida Indians may bring a suit for damages for the occupation and use of tribal land allegedly conveyed unlawfully in 1795.

I

The Oneida Indian Nation of New York, the Oneida Indian Nation of Wisconsin, and the Oneida of the Thames Band Council (the Oneidas) instituted this suit in 1970 against the Counties of Oneida and Madison, New York. The Oneidas alleged that their ancestors conveyed 100,000 acres to the State of New York under a 1795 agreement that violated the Trade and Intercourse Act of 1793 (Nonintercourse Act), 1 Stat. 329, and thus that the transaction was void. The Oneidas' complaint sought damages representing the fair rental value of that part of the land presently owned and occupied by the Counties of Oneida and Madison, for the period January 1, 1968, through December 31, 1969.

The United States District Court for the Northern District of New York initially dismissed the action on the ground that the complaint failed to state a claim arising under the laws of the United States. The United States Court of Appeals for the Second Circuit affirmed. *Oneida Indian Nation* v. *County of Oneida*, 464 F. 2d 916 (1972). We then granted certiorari and reversed. *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661 (1974) *(Oneida I)*. We held unanimously that, at least for jurisdictional purposes, the Oneidas stated a claim for possession under federal law. *Id.*, at 675. The case was remanded for trial.

---

on American Indian Affairs, Inc., et al. by *Arthur Lazarus, Jr.,* and *Jerry C. Straus.*

*Richard K. Hughes* filed a brief for the County of Franklin, New York, et al. as *amici curiae.*

*THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE REHNQUIST join only Part V of this opinion.

On remand, the District Court trifurcated trial of the issues. In the first phase, the court found the counties liable to the Oneidas for wrongful possession of their lands. 434 F. Supp. 527 (1977). In the second phase, it awarded the Oneidas damages in the amount of $16,694, plus interest, representing the fair rental value of the land in question for the 2-year period specified in the complaint. Finally, the District Court held that the State of New York, a third-party defendant brought into the case by the counties, must indemnify the counties for the damages owed to the Oneidas. The Court of Appeals affirmed the trial court's rulings with respect to liability and indemnification. 719 F. 2d 525 (1983). It remanded, however, for further proceedings on the amount of damages. *Id.*, at 542. The counties and the State petitioned for review of these rulings. Recognizing the importance of the Court of Appeals' decision not only for the Oneidas, but potentially for many eastern Indian land claims, we granted certiorari, 465 U. S. 1099 (1984), to determine whether an Indian tribe may have a live cause of action for a violation of its possessory rights that occurred 175 years ago. We hold that the Court of Appeals correctly so ruled.

## II

The respondents in these cases are the direct descendants of members of the Oneida Indian Nation, one of the six nations of the Iroquois, the most powerful Indian Tribe in the Northeast at the time of the American Revolution. See B. Graymont, The Iroquois in the American Revolution (1972) (hereinafter Graymont). From time immemorial to shortly after the Revolution, the Oneidas inhabited what is now central New York State. Their aboriginal land was approximately six million acres, extending from the Pennsylvania border to the St. Lawrence River, from the shores of Lake Ontario to the western foothills of the Adirondack Mountains. See 434 F. Supp., at 533.

Although most of the Iroquois sided with the British, the Oneidas actively supported the colonists in the Revolution. *Ibid.;* see also Graymont, *supra.* This assistance prevented the Iroquois from asserting a united effort against the colonists, and thus the Oneidas' support was of considerable aid. After the War, the United States recognized the importance of the Oneidas' role, and in the Treaty of Fort Stanwix, 7 Stat. 15 (Oct. 22, 1784), the National Government promised that the Oneidas would be secure "in the possession of the lands on which they are settled." Within a short period of time, the United States twice reaffirmed this promise, in the Treaties of Fort Harmar, 7 Stat. 33 (Jan. 9, 1789), and of Canandaigua, 7 Stat. 44 (Nov. 11, 1794).[1]

During this period, the State of New York came under increasingly heavy pressure to open the Oneidas' land for settlement. Consequently, in 1788, the State entered into a "treaty" with the Indians, in which it purchased the vast majority of the Oneidas' land. The Oneidas retained a reservation of about 300,000 acres, an area that, the parties stipulated below, included the land involved in this suit.

In 1790, at the urging of President Washington and Secretary of War Knox, Congress passed the first Indian Trade and Intercourse Act, ch. 33, 1 Stat. 137. See 4 American State Papers, Indian Affairs, Vol. 1, p. 53 (1832); F. Prucha, American Indian Policy in the Formative Years 43–44 (1962). The Act prohibited the conveyance of Indian land except

---

[1] The Treaty of Fort Harmar stated that the Oneidas and the Tuscaroras were "again secured and confirmed in the possession of their respective lands." 7 Stat. 34. The Treaty of Canandaigua of 1794 provided: "The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the state of New-York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them . . . in the free use and enjoyment thereof: but the said reservations shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." 7 Stat. 45.

where such conveyances were entered pursuant to the treaty power of the United States.[2]  In 1793, Congress passed a stronger, more detailed version of the Act, providing that "no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution . . . [and] in the presence, and with the approbation of the commissioner or commissioners of the United States" appointed to supervise such transactions.  1 Stat. 330, § 8.  Unlike the 1790 version, the new statute included criminal penalties for violation of its terms.  *Ibid.*

Despite Congress' clear policy that no person or entity should purchase Indian land without the acquiescence of the Federal Government, in 1795 the State of New York began negotiations to buy the remainder of the Oneidas' land. When this fact came to the attention of Secretary of War Pickering, he warned Governor Clinton, and later Governor Jay, that New York was required by the Nonintercourse Act to request the appointment of federal commissioners to supervise any land transaction with the Oneidas.  See 434 F. Supp., at 534–535.  The State ignored these warnings, and in the summer of 1795 entered into an agreement with the Oneidas whereby they conveyed virtually all of their remaining land to the State for annual cash payments.  *Ibid.*  It is this transaction that is the basis of the Oneidas' complaint in this case.

The District Court found that the 1795 conveyance did not comply with the requirements of the Nonintercourse

---

[2] Section 4 of the 1790 Act declared that "no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." 1 Stat. 138.

Act. *Id.*, at 538–541. In particular, the court stated that "[t]he only finding permitted by the record . . . is that no United States Commissioner or other official of the federal government was present at the . . . transaction." *Id.*, at 535. The petitioners did not dispute this finding on appeal. Rather, they argued that the Oneidas did not have a federal common-law cause of action for this violation. Even if such an action once existed, they contended that the Nonintercourse Act pre-empted it, and that the Oneidas could not maintain a private cause of action for violations of the Act. Additionally, they maintained that any such cause of action was time-barred or nonjusticiable, that any cause of action under the 1793 Act had abated, and that the United States had ratified the conveyance. The Court of Appeals, with one judge dissenting, rejected these arguments. Petitioners renew these claims here; we also reject them and affirm the court's finding of liability.

## III

At the outset, we are faced with petitioner counties' contention that the Oneidas have no right of action for the violation of the 1793 Act. Both the District Court and the Court of Appeals rejected this claim, finding that the Oneidas had the right to sue on two theories: first, a common-law right of action for unlawful possession; and second, an implied statutory cause of action under the Nonintercourse Act of 1793. We need not reach the latter question as we think the Indians' common-law right to sue is firmly established.

### A

#### *Federal Common Law*

By the time of the Revolutionary War, several well-defined principles had been established governing the nature of a tribe's interest in its property and how those interests could be conveyed. It was accepted that Indian nations held

"aboriginal title" to lands they had inhabited from time immemorial. See Cohen, Original Indian Title, 32 Minn. L. Rev. 28 (1947). The "doctrine of discovery" provided, however, that discovering nations held fee title to these lands, subject to the Indians' right of occupancy and use. As a consequence, no one could purchase Indian land or otherwise terminate aboriginal title without the consent of the sovereign.[3] *Oneida I,* 414 U. S., at 667. See Clinton & Hotopp, Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims, 31 Me. L. Rev. 17, 19–49 (1979).

With the adoption of the Constitution, Indian relations became the exclusive province of federal law. *Oneida I, supra,* at 670 (citing *Worcester* v. *Georgia,* 6 Pet. 515, 561 (1832)).[4] From the first Indian claims presented, this Court

---

[3] This Court explained the doctrine of discovery as follows:

"[D]iscovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession.

"The exclusion of all other Europeans, necessarily gave to the nation making the discovery the sole right of acquiring the soil from the natives, and establishing settlements upon it. . . .

"The rights thus acquired being exclusive, no other power could interpose between [the discoverer and the natives].

"In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded; but were necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it." *Johnson* v. *McIntosh,* 8 Wheat. 543, 573–574 (1823).

[4] Madison cited the National Government's inability to control trade with the Indians as one of the key deficiencies of the Articles of Confederation, and urged adoption of the Indian Commerce Clause, Art. 1, § 8,

recognized the aboriginal rights of the Indians to their lands. The Court spoke of the "unquestioned right" of the Indians to the exclusive possession of their lands, *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831), and stated that the Indians' right of occupancy is "as sacred as the fee simple of the whites." *Mitchel* v. *United States*, 9 Pet. 711, 746 (1835). This principle has been reaffirmed consistently. See also *Fletcher* v. *Peck*, 6 Cranch 87, 142–143 (1810); *Johnson* v. *McIntosh*, 8 Wheat. 543 (1823); *Clark* v. *Smith*, 13 Pet. 195, 201 (1839); *Lattimer* v. *Poteet*, 14 Pet. 4 (1840); *Chouteau* v. *Molony*, 16 How. 203 (1854); *Holden* v. *Joy*, 17 Wall. 211 (1872). Thus, as we concluded in *Oneida I*, "the possessory right claimed [by the Oneidas] is a *federal* right to the lands at issue in this case." 414 U. S., at 671 (emphasis in original).

Numerous decisions of this Court prior to *Oneida I* recognized at least implicitly that Indians have a federal common-law right to sue to enforce their aboriginal land rights.[5]  In *Johnson* v. *McIntosh, supra,* the Court declared invalid two private purchases of Indian land that occurred in 1773 and 1775 without the Crown's consent. Subsequently in *Marsh* v. *Brooks*, 8 How. 223, 232 (1850), it was held: "That an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question. This is the result of the decision in Johnson v. McIntosh." More recently, the Court held that Indians have a common-law right of action for an accounting of "all rents, issues and

_____

cl. 3, that granted Congress the power to regulate trade with the Indians. The Federalist No. 42, p. 284 (J. Cooke, ed. 1961). See also Clinton & Hotopp, Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims, 31 Me. L. Rev. 17, 23–29 (1979).

[5] Petitioners argue that *Jaeger* v. *United States*, 27 Ct. Cl. 278 (1892), holds that tribes can sue only when specifically authorized to do so by Congress. *Jaeger* is clearly inapposite to this case. It applied only to the special jurisdiction of the Court of Claims and to claims against the United States.

profits" against trespassers on their land. *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339 (1941).[6] Finally, the Court's opinion in *Oneida I* implicitly assumed that the Oneidas could bring a common-law action to vindicate their aboriginal rights. Citing *United States* v. *Santa Fe Pacific R. Co., supra,* at 347, we noted that the Indians' right of occupancy need not be based on treaty, statute, or other formal Government action. 414 U. S., at 668–669. We stated that "absent federal statutory guidance, the governing rule of decision would be fashioned by the federal court in the mode of the common law." *Id.,* at 674 (citing *United States* v. *Forness,* 125 F. 2d 928 (CA2), cert. denied *sub nom. City of Salamanca* v. *United States,* 316 U. S. 694 (1942)).

In keeping with these well-established principles, we hold that the Oneidas can maintain this action for violation of their possessory rights based on federal common law.

## B

### *Pre-emption*

Petitioners argue that the Nonintercourse Acts pre-empted whatever right of action the Oneidas may have had at common law, relying on our decisions in *Milwaukee* v. *Illinois,* 451 U. S. 304 (1981) *(Milwaukee II),* and *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.,* 453 U. S. 1 (1981). We find this view to be unpersuasive. In determining whether a federal statute pre-empts common-law causes of action, the relevant inquiry is whether

---

[6] See also *Fellows* v. *Blacksmith,* 19 How. 366 (1857) (upholding trespass action on Indian land); *Inupiat Community of the Arctic Slope* v. *United States,* 230 Ct. Cl. 647, 656–657, 680 F. 2d 122, 128–129 (right to sue for trespass is one of rights of Indian title), cert. denied, 459 U. S. 969 (1982); *United States* v. *Southern Pacific Transportation Co.,* 543 F. 2d 676 (CA9 1976) (damages available against railroad that failed to acquire lawful easement or right-of-way over Indian reservation); *Edwardsen* v. *Morton,* 369 F. Supp. 1359, 1371 (DC 1973) (upholding trespass action based on aboriginal title).

the statute "[speaks] *directly* to [the] question" otherwise answered by federal common law. *Milwaukee II, supra,* at 315 (emphasis added). As we stated in *Milwaukee II,* federal common law is used as a "necessary expedient" when Congress has not "spoken to a *particular* issue." 451 U. S., at 313–314 (emphasis added). The Nonintercourse Act of 1793 does not speak directly to the question of remedies for unlawful conveyances of Indian land. A comparison of the 1793 Act and the statute at issue in *Milwaukee II* is instructive.

*Milwaukee II* raised the question whether a common-law action for the abatement of a nuisance caused by the pollution of interstate waterways survived the passage of the 1972 amendments to the Federal Water Pollution Control Act, Pub. L. 92–500, 86 Stat. 816 (FWPCA).[7] FWPCA established an elaborate system for dealing with the problem of interstate water pollution, providing for enforcement of its terms by agency action and citizens suits. See *Milwaukee II, supra,* at 325–327. It also made available civil penalties for violations of the Act. 33 U. S. C. §§ 1319(d), 1365. The legislative history indicated that Congress intended FWPCA to provide a comprehensive solution to the problem of interstate water pollution, as we noted in *Milwaukee II, supra,* at 317–319.

In contrast, the Nonintercourse Act of 1793 did not establish a comprehensive remedial plan for dealing with violations of Indian property rights. There is no indication in the legislative history that Congress intended to pre-empt common-law remedies.[8] Only two sections of the Act, §§ 5 and 8,

---

[7] Previously, in *Illinois* v. *City of Milwaukee,* 406 U. S. 91 (1972), the Court had held that federal common law provided a cause of action for the abatement of interstate water pollution.

[8] There is some contemporaneous evidence to the contrary. President Washington, at whose urging the first Acts were passed, met with Cornplanter, Chief of the Seneca Nation, shortly after the enactment of the 1790 Act. They discussed the Senecas' complaints about land transactions, and

involve Indian lands at all.[9]   The relevant clause of § 8 provides simply that "no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution . . . ."   1 Stat. 330.   It contains no remedial provision.[10] Section 5 subjects individuals who settle on Indian lands to a fine and imprisonment, and gives the President discretionary authority to remove illegal settlers from the Indians' land.[11]

---

Washington assured them that the new statute would protect their interests.   Washington told Cornplanter:

"Here, then, is the security for the remainder of your lands.   No State, nor person, can purchase your lands, unless at some public treaty, held under the authority of the United States. . . .

. . . . .

"If . . . you have any just cause of complaint against [a purchaser] and can make satisfactory proof thereof, the federal courts will be open to you for redress, as to all other persons."   4 American State Papers, Indian Affairs, Vol. 1, p. 142 (1832).

[9] The Act contained 15 sections.   A number of these set out licensing requirements for those who wished to trade with the Indians (§§ 1,2,3). Several others established special requirements for purchasing horses from Indians (§§ 6,7).   Others gave the United States courts jurisdiction over offenses under the Act (§§ 10,11) and provided for the division of fines and forfeitures (§ 12).   1 Stat. 329–333.

[10] The second clause of § 8 makes it a criminal offense to negotiate a treaty or convention for the conveyance of Indian land, except under the authority and in the presence of United States commissioners.   1 Stat. 330.   It likewise makes no provision to restore illegally purchased land to the Indians.

Petitioners make much of the fact that the 1793 Act contained criminal penalties in arguing that the Act pre-empted common-law actions.   In property law, however, it is common to have criminal and civil sanctions available for infringement of property rights, and for government officials to use the police power to remove trespassers from privately owned land. See 5 R. Powell, Real Property ¶ 758 (1984).

[11] The Act authorizes the President "to take such measures, as he may judge necessary, to remove from lands belonging to any Indian tribe, any citizens or inhabitants of the United States, who have made, or shall

Thus, the Nonintercourse Act does not address directly the problem of restoring unlawfully conveyed land to the Indians, in contrast to the specific remedial provisions contained in FWPCA. See *Milwaukee II*, 451 U. S., at 313–315.

Significantly, Congress' action subsequent to the enactment of the 1793 statute and later versions of the Nonintercourse Act demonstrate that the Acts did not pre-empt common-law remedies. In 1822 Congress amended the 1802 version of the Act to provide that "in all trials about the right of property, in which Indians shall be party on one side and white persons on the other, the burden of proof shall rest upon the white person, in every case in which the Indian shall make out a presumption of title in himself from the fact of previous possession and ownership." § 4, 3 Stat. 683; see 25 U. S. C. § 194. Thus, Congress apparently contemplated suits by Indians asserting their property rights.

Decisions of this Court also contradict petitioners' argument for pre-emption. Most recently, in *Wilson* v. *Omaha Indian Tribe*, 442 U. S. 653 (1979), the Omaha Indian Tribe sued to quiet title on land that had surfaced over the years as the Missouri River changed its course. The Omahas based their claim for possession on aboriginal title. The Court construed the 1822 amendment to apply to suits brought by Indian tribes as well as individual Indians. Citing the very sections of the Act that petitioners contend pre-empt a common-law action by the Indians, the Court interpreted the amendment to be part of the overall "design" of the Nonintercourse Acts "to protect the rights of Indians to their properties." *Id.*, at 664. See also *Fellows* v. *Blacksmith*, 19 How. 366 (1857).[12]

---

hereafter make, or attempt to make a settlement thereon." 1 Stat. 330. It imposes no obligation on the Executive to take remedial action, and apparently was intended only to give the President discretionary authority to preserve the peace.

[12] Similarly, we find no support for petitioners' contention that the availability of suits by the United States on behalf of Indian tribes precludes

We recognized in *Oneida I* that the Nonintercourse Acts simply "put in statutory form what was or came to be the accepted rule—that the extinguishment of Indian title required the consent of the United States." 414 U. S., at 678. Nothing in the statutory formulation of this rule suggests that the Indians' right to pursue common-law remedies was thereby pre-empted. Accordingly, we hold that the Oneidas' right of action under federal common law was not pre-empted by the passage of the Nonintercourse Acts.

## IV

Having determined that the Oneidas have a cause of action under federal common law, we address the question whether there are defenses available to the counties. We conclude that none has merit.

### A
#### Statute of Limitations

There is no federal statute of limitations governing federal common-law actions by Indians to enforce property rights. In the absence of a controlling federal limitations period, the general rule is that a state limitations period for an analogous cause of action is borrowed and applied to the federal claim, provided that the application of the state statute would not be inconsistent with underlying federal policies.[13]    See

---

common-law actions by the tribes themselves. See *Poafpybitty* v. *Skelly Oil Co.*, 390 U. S. 365, 369 (1968); *Creek Nation* v. *United States*, 318 U. S. 629, 640 (1943) (citing *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641 (1890); *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294 (1902); and *Lone Wolf* v. *Hitchcock*, 187 U. S. 553 (1903)). See also *Moe* v. *Confederated Salish & Kootenai Tribes*, 425 U. S. 463, 473 (1976) ("[I]t would appear that Congress contemplated that a tribe's access to federal court to litigate a matter arising 'under the Constitution, laws, or treaties' would be at least in some respects as broad as that of the United States suing as the tribe's trustee").

[13] Under the Supremacy Clause, state-law time bars, *e. g.*, adverse possession and laches, do not apply of their own force to Indian land title claims. See *Ewert* v. *Bluejacket*, 259 U. S. 129, 137–138 (1922); *United*

*Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 465 (1975). See also *Occidental Life Ins. Co.* v. *EEOC*, 432 U. S. 355, 367 (1977). We think the borrowing of a state limitations period in these cases would be inconsistent with federal policy. Indeed, on a number of occasions Congress has made this clear with respect to Indian land claims.

In adopting the statute that gave jurisdiction over civil actions involving Indians to the New York courts, Congress included this proviso: "[N]othing herein contained shall be construed as conferring jurisdiction on the courts of the State of New York or making applicable the laws of the State of New York in civil actions involving Indian lands or claims with respect thereto which relate to transactions or events transpiring prior to September 13, 1952." 25 U. S. C. § 233. This proviso was added specifically to ensure that the New York statute of limitations would not apply to pre-1952 land claims.[14] In *Oneida I*, we relied on the legislative history of 25 U. S. C. § 233 in concluding that Indian land claims were exclusively a matter of federal law. 414 U. S., at 680–682. This history also reflects congressional policy against the application of state statutes of limitations in the context of Indian land claims.

Congress recently reaffirmed this policy in addressing the question of the appropriate statute of limitations for certain claims brought by the United States on behalf of Indians. Originally enacted in 1966, this statute provided a special limitations period of 6 years and 90 days for contract and tort suits for damages brought by the United States on

---

*States* v. *Ahtanum Irrigation District*, 236 F. 2d 321, 334 (CA9 1956), cert. denied, 352 U. S. 988 (1957).

[14] Representative Morris, the sponsor of the proviso, stated:

"As it is now, the Indians, as we know, are wards of the Government and, therefore, the statute of limitations does not run against them as it does in the ordinary case. This [proviso] will preserve their rights so that the statute will not be running against them concerning those claims that might have arisen before the passage of this act." 96 Cong. Rec. 12460 (1950).

behalf of Indians. 28 U. S. C. §§ 2415(a), (b). The statute stipulated that claims that accrued prior to its date of enactment, July 18, 1966, were deemed to have accrued on that date. § 2415(g). Section 2415(c) excluded from the limitations period all actions "to establish the title to, or right of possession of, real or personal property."

In 1972 and again in 1977, 1980, and 1982, as the statute of limitations was about to expire for pre-1966 claims, Congress extended the time within which the United States could bring suits on behalf of the Indians. The legislative history of the 1972, 1977, and 1980 amendments demonstrates that Congress did not intend § 2415 to apply to suits brought by the Indians themselves, and that it assumed that the Indians' right to sue was not otherwise subject to any statute of limitations. Both proponents and opponents of the amendments shared these views. See 123 Cong. Rec. 22167–22168 (1977) (remarks of Rep. Dicks, arguing that extension is unnecessary because the Indians can bring suit even if the statute of limitations expires for the United States); id., at 22166 and 22499 (remarks of Rep. Cohen, arguing that the basic problem with the bill is its failure to limit suits brought by Indians); 126 Cong. Rec. 3289 (1980) (remarks of Sen. Melcher, reiterating with respect to the 1980 extension Rep. Dicks' argument against the 1977 extension); id., at 3290 (remarks of Sen. Cohen, same); Statute of Limitations Extension: Hearing before the Senate Select Committee on Indian Affairs, 96th Cong., 1st Sess., 312–314 (1979); Statute of Limitations Extension for Indian Claims: Hearings on S. 1377 before the Senate Select Committee on Indian Affairs, 95th Cong., 1st Sess., 76–77 (1977); Time Extension for Commencing Actions on Behalf of Indians: Hearing on S. 3377 and H. R. 13825 before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 92d Cong., 2d Sess., 23 (1972).

With the enactment of the 1982 amendments, Congress for the first time imposed a statute of limitations on certain tort

and contract claims for damages brought by individual Indians and Indian tribes. These amendments, enacted as the Indian Claims Limitation Act of 1982, Pub. L. 97–394, 96 Stat. 1976, note following 28 U. S. C. § 2415, established a system for the final resolution of pre-1966 claims cognizable under §§ 2415(a) and (b). The Act directed the Secretary of the Interior to compile and publish in the Federal Register a list of all Indian claims to which the statute of limitations provided in 28 U. S. C. § 2415 applied. The Act also directed that the Secretary notify those Indians who may have an interest in any such claims. The Indians were then given an opportunity to submit additional claims; these were to be compiled and published on a second list. Actions for claims subject to the limitations periods of § 2415 that appeared on neither list were barred unless commenced within 60 days of the publication of the second list. If at any time the Secretary decides not to pursue a claim on one of the lists, "*any* right of action shall be barred unless the complaint is filed within one year after the date of publication [of the notice of the Secretary's decision] in the Federal Register." Pub. L. 97–394, 96 Stat. 1978, § 5(c) (emphasis added). Thus, § 5(c) implicitly imposed a 1-year statute of limitations within which the Indians must bring contract and tort claims that are covered by §§ 2415(a) and (b) and not listed by the Secretary. So long as a listed claim is neither acted upon nor formally rejected by the Secretary, it remains live.[15]

---

[15] The two lists were published in the Federal Register on March 31, 1983, and November 7, 1983, respectively. 48 Fed. Reg. 13698, 51204. The Oneidas' claims are on the first list compiled by the Secretary. *Id.*, at 13920. These claims would not be barred, however, even if they were not listed. The Oneidas commenced this suit in 1970 when no statute of limitations applied to claims brought by the Indians themselves. Additionally, if claims like the Oneidas', *i. e.*, damages actions that involve litigating the continued vitality of aboriginal title, are construed to be suits "to establish the title to, or right of possession of, real or personal property," they would be exempt from the statute of limitations of the Indian Claims Limitations

The legislative history of the successive amendments to § 2415 is replete with evidence of Congress' concern that the United States had failed to live up to its responsibilities as trustee for the Indians, and that the Department of the Interior had not acted with appropriate dispatch in meeting the deadlines provided by § 2415. *E. g.*, Authorizing Indian Tribes to Bring Certain Actions on Behalf of their Members with Respect to Certain Legal Claims, and for Other Purposes, H. R. Rep. No. 97–954, p. 5 (1982). By providing a 1-year limitations period for claims that the Secretary decides not to pursue, Congress intended to give the Indians one last opportunity to file suits covered by § 2415(a) and (b) on their own behalf. Thus, we think the statutory framework adopted in 1982 presumes the existence of an Indian right of action not otherwise subject to any statute of limitations. It would be a violation of Congress' will were we to hold that a state statute of limitations period should be borrowed in these circumstances.

## B

### *Laches*

The dissent argues that we should apply the equitable doctrine of laches to hold that the Oneidas' claim is barred. Although it is far from clear that this defense is available in suits such as this one,[16] we do not reach this issue today.

---

Act of 1982. The Government agrees with this view. Brief for United States as *Amicus Curiae* 24–25.

[16] We note, as JUSTICE STEVENS properly recognizes, that application of the equitable defense of laches in an action at law would be novel indeed. Moreover, the logic of the Court's holding in *Ewert* v. *Bluejacket*, 259 U. S. 129 (1922), seems applicable here: "the equitable doctrine of laches, developed and designed to protect good-faith transactions against those who have slept on their rights, with knowledge and ample opportunity to assert them, cannot properly have application to give vitality to a void deed and to bar the rights of Indian wards in lands subject to statutory restrictions." *Id.*, at 138. Additionally, this Court has indicated that extinguishment of Indian title requires a sovereign act. See, *e. g.*, *Oneida I*, 414 U. S. 661, 670 (1974); *United States* v. *Candelaria*, 271 U. S. 432, 439

While petitioners argued at trial that the Oneidas were guilty of laches, the District Court ruled against them and they did not reassert this defense on appeal. As a result, the Court of Appeals did not rule on this claim, and we likewise decline to do so.

## C

### *Abatement*

Petitioners argue that any cause of action for violation of the Nonintercourse Act of 1793 abated when the statute expired. They note that Congress specifically provided that the 1793 Act would be in force "for the term of two years, and from thence to the end of the then next session of Congress, and no longer." 1 Stat. 332, § 15. They contend that the 1796 version of the Nonintercourse Act repealed the 1793 version and enacted an entirely new statute, and that under the common-law abatement doctrine in effect at the time, any cause of action for violation of the statute finally abated on the expiration of the statute.[17] We disagree.

The pertinent provision of the 1793 Act, § 8, like its predecessor, § 4 of the 1790 Act, 1 Stat. 138, merely codified the principle that a sovereign act was required to extinguish aboriginal title and thus that a conveyance without the sovereign's consent was void *ab initio*. See *supra*, at 233–234,

---

(1926), quoting *United States* v. *Sandoval,* 231 U. S. 28, 45–47 (1913). In these circumstances, it is questionable whether laches properly could be applied. Furthermore, the statutory restraint on alienation of Indian tribal land adopted by the Nonintercourse Act of 1793 is still the law. See 25 U. S. C. § 177. This fact not only distinguishes the cases relied upon by the dissent, but also suggests that, as with the borrowing of state statutes of limitations, the application of laches would appear to be inconsistent with established federal policy. Although the issue of laches is not before us, we add these observations in response to the dissent.

[17] It is questionable whether the common-law doctrine of abatement is even relevant to the statutory provision at issue in this case. The doctrine principally applies to criminal law, and provides that all prosecutions that have not proceeded to final judgment under a statute that has been repealed or has expired have abated, unless the repealing legislature provides otherwise. See *Warden* v. *Marrero,* 417 U. S. 653, 660 (1974).

and n. 3. All of the subsequent versions of the Nonintercourse Act, including that now in force, 25 U. S. C. § 177, contain substantially the same restraint on the alienation of Indian lands. In these circumstances, the precedents of this Court compel the conclusion that the Oneidas' cause of action has not abated.[18]

## D

### *Ratification*

We are similarly unpersuaded by petitioners' contention that the United States has ratified the unlawful 1795 conveyances. Petitioners base this argument on federally approved treaties in 1798 and 1802 in which the Oneidas ceded additional land to the State of New York.[19] There is a question

---

[18] The reasoning of *Bear Lake and River Water Works and Irrigation Co.* v. *Garland*, 164 U. S. 1, 11–12 (1896), is directly on point:

"Although there is a formal repeal of the old by the new statute, still there never has been a moment of time since the passage of the [old] act . . . when these similar provisions have not been in force. Notwithstanding, therefore, this formal repeal, it is . . . entirely correct to say that the new act should be construed as a continuation of the old . . . ."

Accord, *Steamship Co*: v. *Joliffe*, 2 Wall. 450, 458 (1865); *Great Northern R. Co.* v. *United States*, 155 F. 945, 948 (CA8 1907), aff'd, 208 U. S. 452 (1908).

[19] The 1798 Treaty provided:

"[T]he said Indians do cede release and quit claim to the people of the State of New York forever all the lands within their reservation to the westward and southwestward of a line from the northeastern corner of lot No. 54 in *the last purchase from them* running northerly to a Button wood tree . . . standing on the bank of the Oneida lake." Treaty of June 1, 1798, reproduced in Ratified Indian Treaties 1722–1869, National Archives Microfilm Publications, Microcopy No. 668 (roll 2) (emphasis added).

The 1802 Treaty provided:

"All that certain tract of land beginning at the southwest corner of the land lying along the Gennesee Road, . . . and running thence along the last mentioned tract easterly to the southeast corner thereof; thence southerly, in the direction of the continuation of the east bounds of said last mentioned tract, to *other lands heretofore ceded* by the said Oneida nation of Indians to the People of the State of New York." Treaty of June 4, 1802,

whether the 1802 treaty ever became effective.[20]   Assuming it did, neither the 1798 nor the 1802 treaty qualifies as federal ratification of the 1795 conveyance.

The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.   Thus, it is well established that treaties should be construed liberally in favor of the Indians, *Choctaw Nation* v. *United States*, 318 U. S. 423, 431–432 (1943); *Choate* v. *Trapp*, 224 U. S. 665, 675 (1912), with ambiguous provisions interpreted to their benefit, *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 174 (1973); *Carpenter* v. *Shaw*, 280 U. S. 363, 367 (1930); *Winters* v. *United States*, 207 U. S. 564, 576–577 (1908).   "Absent explicit statutory language," *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 690 (1979), this Court accordingly has refused to find that Congress has abrogated Indian treaty rights.   *Menominee Tribe* v. *United States*, 391 U. S. 404 (1968).   See generally F. Cohen, Handbook of Federal Indian Law 221–225 (1982 ed.) (hereinafter F. Cohen).

The Court has applied similar canons of construction in nontreaty matters.   Most importantly, the Court has held that congressional intent to extinguish Indian title must be

reproduced in 4 American State Papers, Indian Affairs, Vol. 1, p. 664 (1832) (emphasis added).

[20] Although both treaties were approved by the Senate, see 1 Journal of the Executive Proceedings of the Senate of the United States 312 (1828); *id.*, at 428, neither is contained in the compilation of "all Treaties with . . . Indian tribes" compiled at Congress' direction.   See J. Res. 10, 5 Stat. 799 (1845).   There is evidence that President Adams signed the 1798 Treaty in the February 23, 1799, entry in his Journal of executive actions, March 1797–March 1799 ("Signed a treaty with the Oneida nation"), reproduced in The Adams Family Papers, John Adams, *Misc.* (Lib. Cong. Reel No. 194). Moreover, the 1798 Treaty was included in an 1822 compilation of treaties with the Indians that extinguished Indian title in New York.   H. R. Doc. No. 74, 17th Cong., 1st Sess., 8 (1822).   There is no similar evidence that the 1802 Treaty was signed by the President.

"plain and unambiguous," *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S., at 346, and will not be "lightly implied," *id.*, at 354. Relying on the strong policy of the United States "from the beginning to respect the Indian right of occupancy," *id.*, at 345 (citing *Cramer* v. *United States*, 261 U. S. 219, 227 (1923)), the Court concluded that it "[c]ertainly" would require "plain and unambiguous action to deprive the [Indians] of the benefits of that policy," 314 U. S., at 346. See F. Cohen.

In view of these principles, the treaties relied upon by petitioners are not sufficient to show that the United States ratified New York's unlawful purchase of the Oneidas' land. The language cited by petitioners, a reference in the 1798 treaty to "the last purchase" and one in the 1802 treaty to "land heretofore ceded," far from demonstrates a plain and unambiguous intent to extinguish Indian title. See n. 19, *supra*. There is no indication that either the Senate or the President intended by these references to ratify the 1795 conveyance. See 1 Journal of the Executive Proceedings of the Senate 273, 312, 408, 428 (1828).[21]

E

*Nonjusticiability*

The claim also is made that the issue presented by the Oneidas' action is a nonjusticiable political question. The counties contend first that Art. 1, § 8, cl. 3, of the Constitution explicitly commits responsibility for Indian affairs to Congress.[22] Moreover, they argue that Congress has given exclusive civil remedial authority to the Executive for cases

---

[21] The cases relied upon by petitioners likewise do not support a finding of ratification here. *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584 (1977), expressly reaffirmed the principles of construction which we apply in this case. Petitioners' other cases, *e. g.*, *FPC* v. *Tuscarora Indian Nation*, 362 U. S. 99 (1960), and *Shoshone Tribe* v. *United States*, 299 U. S. 476 (1937), do so implicitly.

[22] "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

such as this one, citing the Nonintercourse Acts and the 1794 Treaty of Canandaigua.[23] Thus, they say this case falls within the political question doctrine because of "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker* v. *Carr,* 369 U. S. 186, 217 (1962). Additionally, the counties argue that the question is nonjusticiable because there is "an unusual need for unquestioning adherence to a political decision already made." *Ibid.* None of these claims is meritorious.

This Court has held specifically that Congress' plenary power in Indian affairs under Art. 1, § 8, cl. 3, does not mean that litigation involving such matters necessarily entails nonjusticiable political questions. *Delaware Tribal Business Committee* v. *Weeks,* 430 U. S. 73, 83–84 (1977). Accord, *United States* v. *Sioux Nation,* 448 U. S. 371, 413 (1980). See also *Baker* v. *Carr, supra,* at 215–217. If Congress' constitutional authority over Indian affairs does not render the Oneidas' claim nonjusticiable, *a fortiori,* Congress' delegation of authority to the President does not do so either.[24]

We are also unpersuaded that petitioners have shown "an unusual need for unquestioning adherence to a political decision already made." *Baker* v. *Carr, supra,* at 217.

---

[23] The counties rely on the language in the Treaty providing that "complaint shall be made by . . . the Six Nations or any of them, to the President of the United States, or the Superintendent by him appointed . . . and such prudent measures shall then be pursued as shall be necessary to preserve our peace and friendship unbroken; until the legislature . . . of the United States shall make other equitable provision for the purpose." Art. VII, Treaty of Canandaigua, Nov. 11, 1794, 7 Stat. 46.

[24] Moreover, Congress' delegation to the President is not a "textually demonstrable *constitutional* commitment," *Baker* v. *Carr,* 369 U. S., at 217 (emphasis added), but rather a statutory commitment of authority. We have held today that the Nonintercourse Acts do not pre-empt common-law causes of action by Indian tribes to enforce their property rights. The language in the Treaty of Canandaigua, see n. 23, *supra,* is likewise an insufficient basis on which to find that the Oneidas' federal common-law right of action has been pre-empted. Thus, the predicate of petitioners' argument, that Congress has delegated exclusive civil remedial authority to the President, must fail.

The basis for their argument is the fact that in 1968, the Commissioner of Indian Affairs declined to bring an action on behalf of the Oneidas with respect to the claims asserted in these cases. The counties cite no cases in which analogous decisions provided the basis for nonjusticiability. Cf. *INS* v. *Chadha*, 462 U. S. 919 (1983); *United States* v. *Nixon*, 418 U. S. 683 (1974); *Powell* v. *McCormack*, 395 U. S. 486 (1969). Our cases suggest that such "unusual need" arises most of the time, if not always, in the area of foreign affairs. *Baker* v. *Carr, supra*, at 211–213; see also *Gilligan* v. *Morgan*, 413 U. S. 1 (1973). Nor do the counties offer convincing reasons for thinking that there is a need for "unquestioning adherence" to the Commissioner's decision. Indeed, the fact that the Secretary of the Interior has listed the Oneidas' claims under the § 2415 procedure suggests that the Commissioner's 1968 decision was not a decision on the merits of the Oneidas' claims. See n. 15, *supra*.[25]

We conclude, therefore, that the Oneidas' claim is not barred by the political question doctrine.

## V

Finally, we face the question whether the Court of Appeals correctly held that the federal courts could exercise ancillary jurisdiction over the counties' cross-claim against the State of New York for indemnification. The counties assert that this claim arises under both state and federal law. The Court of Appeals did not decide whether it was based on state or federal law. See 719 F. 2d, at 542–544. It held, however, that the 1790 and 1793 Nonintercourse Acts "placed New York on notice that Congress had exercised its power to regulate commerce with the Indians. Thus, anything New York

---

[25] We note that the Commissioner's decision was based on the fact that the same claims were then pending before the Indian Claims Commission. The Oneidas have since withdrawn their claims from the Indian Claims Commission.

thereafter did with respect to Indian lands carried with it a waiver of the State's eleventh amendment immunity." *Id.*, at 543 (citing *Edelman* v. *Jordan*, 415 U. S. 651, 672 (1974), and *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279, 283–284 (1973)). In essence, the Court of Appeals held that by violating a federal statute, the State consented to suit in federal court by any party on any claim, state or federal, growing out of the same nucleus of operative facts as the statutory violation. This proposition has no basis in law.

The counties' cross-claim for indemnification raises a classic example of ancillary jurisdiction. See *Owen Equipment & Erection Co.* v. *Kroger*, 437 U. S. 365 (1978). The Eleventh Amendment forecloses, however, the application of normal principles of ancillary and pendent jurisdiction where claims are pressed against the State. *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89 (1984). As we held in *Pennhurst:* "[N]either pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment. A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." *Id.*, at 121. The indemnification claim here, whether cast as a question of New York law or federal common law, is a claim against the State for retroactive monetary relief. In the absence of the State's consent, *id.*, at 99 (citing *Clark* v. *Barnard*, 108 U. S. 436, 447 (1883)), the suit is barred by the Eleventh Amendment. Thus, as the Court of Appeals recognized, whether the State has consented to waive its constitutional immunity is the critical factor in whether the federal courts properly exercised ancillary jurisdiction over the counties' claim for indemnification. *Pennhurst, supra.*

The only ground the Court of Appeals and the counties offer for believing that the State has consented to suit in federal court on this claim is the fact that it violated the 1793 Nonintercourse Act by purchasing the Oneidas' land.

The counties assert that because the Constitution specifically authorizes Congress "[t]o regulate Commerce . . . with the Indian Tribes," the States necessarily consented to suit in federal court with respect to enactments under this Clause. See *County of Monroe* v. *Florida*, 678 F. 2d 1124 (CA2 1982) (making an analogous argument with respect to Congress' extradition power), cert. denied, 459 U. S. 1104 (1983); *Mills Music, Inc.* v. *Arizona*, 591 F. 2d 1278, 1285 (CA9 1979) (making such an argument with respect to Congress' power over copyright and patents). Thus, they contend, Congress can abrogate the States' Eleventh Amendment immunity and has done so by enacting the Nonintercourse Acts. By violating the 1793 Act, the State thus waived its immunity to suit in federal court with respect to such violations.

Assuming, without deciding, that this reasoning is correct, it does not address the Eleventh Amendment problem here, for the counties' indemnification claim against the State does not arise under the 1793 Act. The counties cite no authority for their contrary view. They urge simply that the State would be unjustly enriched if the counties were forced to pay the Oneidas without indemnity from the State, and thus that the Court should "fashion a remedy" for the counties under the 1793 Act. This is an argument on the merits; it is not an argument that the indemnification claim arises under the Act. As we said in *Pennhurst*, "[a] State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." 465 U. S., at 99 (emphasis in original). The Eleventh Amendment bar does not vary with the merits of the claims pressed against the State.

We conclude, therefore, that the counties' cross-claim for indemnity by the State raises a question of state law. We are referred to no evidence that the State has waived its constitutional immunity to suit in federal court on this question.[26]

---

[26] Three cases establish our approach to the test of waiver of the Eleventh Amendment. *Edelman* v. *Jordan*, 415 U. S. 651 (1974); *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279 (1973); and

Thus, under *Pennhurst,* we hold that the federal courts erred in exercising ancillary jurisdiction over this claim.

## VI

The decisions of this Court emphasize "Congress' unique obligation toward the Indians." *Morton* v. *Mancari,* 417 U. S. 535, 555 (1974). The Government, in an *amicus curiae* brief, urged the Court to affirm the Court of Appeals. Brief for United States as *Amicus Curiae* 28. The Government recognized, as we do, the potential consequences of affirmance. It was observed, however, that "Congress has enacted legislation to extinguish Indian title and claims related thereto in other eastern States, . . . and it could be expected to do the same in New York should the occasion arise." *Id.,* at 29–30. See Rhode Island Indian Claims Settlement Act, 25 U. S. C. § 1701 *et seq.;* Maine Indian Claims Settlement Act, 25 U. S. C. § 1721 *et seq.* We agree that this litigation makes abundantly clear the necessity for congressional action.

One would have thought that claims dating back for more than a century and a half would have been barred long ago. As our opinion indicates, however, neither petitioners nor we have found any applicable statute of limitations or other relevant legal basis for holding that the Oneidas' claims are barred or otherwise have been satisfied. The judgment of the Court of Appeals is affirmed with respect to the finding of liability under federal common law,[27] and reversed with respect to the exercise of ancillary jurisdiction over the

---

*Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964). Although each of these involved waiver for purposes of suit under a federal statute, we indicated in *Pennhurst* that the same standards apply in the context of a state statute. 465 U. S., at 99–100.

[27] The question whether equitable considerations should limit the relief available to the present day Oneida Indians was not addressed by the Court of Appeals or presented to this Court by petitioners. Accordingly, we express no opinion as to whether other considerations may be relevant to the final disposition of this case should Congress not exercise its authority to resolve these far-reaching Indian claims.

counties' cross-claim for indemnification. The cases are remanded to the Court of Appeals for further proceedings consistent with our decision.

*It is so ordered.*

JUSTICE STEVENS concurs in the judgment with respect to No. 83–1240.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I join the Court's opinion except for Part V. I dissent from Part V because I adhere to my view that the Eleventh Amendment "bars federal court suits against States only by citizens of other States," *Yeomans* v. *Kentucky*, 423 U. S. 983, 984 (1975) (BRENNAN, J., dissenting). Thus, I would hold that the State of New York is not entitled to invoke the protections of that Amendment in this federal-court suit by counties of New York. See *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279, 298 (1973) (BRENNAN, J., dissenting); *Edelman* v. *Jordan*, 415 U. S. 651, 687 (1974) (BRENNAN, J., dissenting). In my view, *Hans* v. *Louisiana*, 134 U. S. 1 (1890), erects a limited constitutional barrier prohibiting suits against States by citizens of another State; the decision, however, "accords to nonconsenting States only a *nonconstitutional* immunity from suit by its own citizens." *Employees* v. *Missouri Dept. of Public Health and Welfare, supra,* at 313 (BRENNAN, J., dissenting) (emphasis added). For scholarly discussion supporting this view, see Shapiro, Wrong Turns: The Eleventh Amendment and the *Pennhurst* Case, 98 Harv. L. Rev. 61, 68 (1984); Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889, 1893–1894 (1983); Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part One, 126 U. Pa. L. Rev. 515, 538–540, and n. 88 (1978).

JUSTICE STEVENS, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE REHNQUIST join, dissenting in No. 83–1065.

In 1790, the President of the United States notified Cornplanter, the Chief of the Senecas, that federal law would securely protect Seneca lands from acquisition by any State or person:

"If . . . you have any just cause of complaint against [a purchaser] and can make satisfactory proof thereof, the federal courts will be open to you for redress, as to all other persons." 4 American State Papers, Indian Affairs, Vol. 1, p. 142 (1832).[1]

The elders of the Oneida Indian Nation received comparable notice of their capacity to maintain the federal claim that is at issue in this litigation.[2] They made no attempt to assert the claim, and their successors in interest waited 175 years before bringing suit to avoid a 1795 conveyance that the Tribe freely made, for a valuable consideration. The absence of any evidence of deception, concealment, or interference with the Tribe's right to assert a claim, together with the societal interests that always underlie statutes of repose—particu-

---

[1] Before 1875 when "Congress conferred upon the lower federal courts, for but the second time in their nearly century-old history, general federal-question jurisdiction," Steffel v. Thompson, 415 U. S. 452, 464 (1974); Judiciary Act of March 3, 1875, 18 Stat. 470, an Indian tribe could only raise its federal land claims in this Court by appealing a state-court judgment, Judiciary Act of 1789, ch. 20, § 25, 1 Stat. 85. Until Congress made Indians United States citizens in the Act of June 2, 1924, ch. 233, 43 Stat. 253, they were not generally considered "citizens" for the purposes of diversity jurisdiction in the lower federal courts. Nor were the tribes "foreign states" entitled to apply for original jurisdiction in this Court. Cherokee Nation v. Georgia, 5 Pet. 1 (1831).

[2] During the negotiations leading to the 1795 treaty with New York, a federal agent informed the Tribe that no local treaty could validly transfer their interest in lands without the presence of a United States Indian Commissioner, Record Doc. No. 37, p. 122.

larly when title to real property is at stake—convince me that this claim is barred by the extraordinary passage of time. It is worthy of emphasis that this claim arose when George Washington was the President of the United States.

The Court refuses to apply any time bar to this claim, believing that to do so would be inconsistent with federal Indian policy. This Court, however, has always applied the equitable doctrine of laches when Indians or others have sought, in equity, to set aside conveyances made under a statutory or common-law incapacity to convey. Although this action is brought at law, in ejectment, there are sound reasons for recognizing that it is barred by similar principles.

In reaching a contrary conclusion, the Court relies on the legislative histories of a series of recent enactments. In my view, however, the Oneida were barred from avoiding their 1795 conveyance long before 1952, when Congress enacted the first statute that the Court relies on today. Neither that statute, nor any subsequent federal legislation, revived the Oneida's dormant claim.

I

Today's decision is an unprecedented departure from the wisdom of the common law:

> "The best interests of society require that causes of action should not be deferred an unreasonable time. This remark is peculiarly applicable to land titles. Nothing so much retards the growth and prosperity of a country as insecurity of titles to real estate. Labor is paralysed where the enjoyment of its fruits is uncertain; and litigation without limit produces ruinous consequences to individuals." *Lewis* v. *Marshall,* 5 Pet. 470, 477–478 (1831).

Of course, as the Court notes, there "is no federal statute of limitations governing federal common-law actions by Indians to enforce property rights." *Ante,* at 240. However, "where Congress has not spoken but left matters for judicial determination within the general framework of familiar legal

principles," *Holmberg* v. *Armbrecht*, 327 U. S. 392, 395 (1946), the settled practice has been to adopt the state law of limitations as federal law.

The Court has recognized that "State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies." *Occidental Life Ins. Co.* v. *EEOC*, 432 U. S. 355, 367 (1977). The Court, for example, has refused to apply state laws of limitations when a more analogous federal statute of limitations better reflects the appropriate balance between the enforcement of federal substantive policies and the historic principles of repose,[3] or when a unique federal interest in the subject matter or a paramount interest in national uniformity require the fashioning of a federal time bar in order to avoid serious conflict with federal policies or functions.[4] In applying these principles, however, the Court has always presumed that *some* principle of limitation applies to federal causes of action.[5] Thus, in *Occidental Life Ins. Co.*, the Court concluded that Congress had intended no rigid time

[3] *DelCostello* v. *Teamsters*, 462 U. S. 151 (1983); cf. *McAllister* v. *Magnolia Petroleum Co.*, 357 U. S. 221 (1958).

[4] *Holmberg* v. *Armbrecht*, 327 U. S. 392, 395 (1946) ("We have the duty of federal courts, sitting as national courts throughout the country, to apply their own principles in enforcing an equitable right created by Congress").

[5] In cases arising in admiralty, the Court has traditionally applied the equitable doctrine of laches. See, *e. g.*, *Gutierrez* v. *Waterman S.S. Corp.*, 373 U. S. 206, 215 (1963). In territorial disputes arising under our original jurisdiction we have applied the doctrine of acquiescence which confirms the legal validity of a boundary line accepted for a considerable length of time by all parties as the actual boundary between two States, notwithstanding any irregularities in its legal origin. See *California* v. *Nevada*, 447 U. S. 125, 130–132 (1980); *Ohio* v. *Kentucky*, 410 U. S. 641, 650–651 (1973). Under the lost grant doctrine, "lapse of time," under carefully limited circumstances, "may cure the neglect or failure to secure the proper muniments of title," even against the United States. *United States* v. *Fullard-Leo*, 331 U. S. 256, 270 (1947).

limit for EEOC enforcement actions, but the Court also recognized that federal courts have adequate power to bar an action if the defendant was "significantly handicapped in making his defense because of an inordinate EEOC delay." *Id.*, at 373.

Before 1966 there was no federal statute of limitations that even arguably could have supplanted a state limitation. Even the longest possibly applicable state statute of limitations would surely have barred this cause of action—which arose in 1795—many years before 1966.[6] Moreover, "[a] state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation." *Robertson* v. *Wegmann*, 436 U. S. 584, 593 (1978). Nor is the rejection of a generally applicable state law inappropriate merely because one party is an Indian tribe and the subject matter of the litigation involves tribal property. *Wilson* v. *Omaha Indian Tribe*, 442 U. S. 653, 673–674 (1979). Thus, a routine application of our practice in dealing with limitations questions would lead to the conclusion that this claim is barred by the lapse of time.

Nevertheless, there are unique considerations in cases involving Indian claims that warrant a departure from the ordinary practice. Indians have long occupied a protected status in our law, and in the 19th century they were often characterized as wards of the State.[7] At common law, conveyances of

---

[6] While the current New York period of limitations applicable to actions "to recover real property or its possession" presently is 10 years, N. Y. Civ. Prac. Law. § 212 (McKinney 1972), the period in 1795 was 50 years, 1788 N. Y. Laws, ch. 43, p. 685.

[7] See *Felix* v. *Patrick*, 145 U. S. 317, 330 (1892) ("Whatever may have been the injustice visited upon this unfortunate race of people by their white neighbors, this court has repeatedly held them to be the wards of the nation, entitled to a special protection in its courts, and as persons 'in a state of pupilage'"); *Chouteau* v. *Molony*, 16 How. 203, 237–238 (1854) (Under Spanish law, "Indians, although of age, continue to enjoy the rights of minors, to avoid contracts or other sales of their property—particularly

persons subject to similar disabilities were void. In practice, however, the common-law courts modified the wooden rules ordinarily applied to real property claims in actions at law in order to protect the ward, as far as possible, from manipulation, while at the same time avoiding the obvious inequity involved in the setting aside, at a distant date, of conveyances that had been freely made, for valuable consideration.

For example, the statute of limitations applicable to actions seeking to gain recovery of the real estate conveyed under such disabilities did not begin to run against a ward until his unique disabilities had been overcome.[8] Thus, to be faithful to these common-law principles, the application of a state statute of limitations in the context of ancient Indian claims would require flexible consideration of the development of the particular tribe's capacity to govern its own affairs.

real—made without authority of the judiciary or the intervention of their legal protectors. Indians are considered as persons under legal disability . . .") (citation omitted); *Georgia & the Treaty of Indian Spring*, 2 Op. Atty. Gen. 110, 133 (1828) (Although under federal law Indians have a limited capacity to contract for the sale of their lands, "[a] limited capacity to contract is no anomaly in the law. Infants have this limited capacity to contract . . . ; beyond this limit, their contracts are void. . . . Yet it was never imagined that, because their independence or competency was not absolute and universal, but limited, that therefore their contracts *within the sphere of their competency* were to be differently construed from those of other persons"); see also *ante*, at 241, n. 14 (opinion of the Court); *United States* v. *Kagama*, 118 U. S. 375, 383–384 (1886); *Cherokee Nation* v. *Georgia*, 5 Pet., at 17.

[8] See 2 W. Blackstone, Commentaries *291–*292; 2 J. Kent, Commentaries on American Law 248–249 (8th ed. 1854); 5 G. Thompson, Real Property § 2556 (1979); 6 G. Thompson, Real Property § 2947 (1962); cf. *Schrimpscher* v. *Stockton*, 183 U. S. 290, 296 (1902) ("Conceding, but without deciding, that so long as Indians maintain their tribal relations they are not chargeable with laches or failure to assert their claims within the time prescribed by statutes, . . . they would lose this immunity when their relations with their tribe were dissolved by accepting allotments of lands in severalty").

260

Moreover, the common law developed prescription doctrines that terminated the vendor's power to avoid a void conveyance in an action in ejectment. These doctrines could deny the ward, or those claiming under him, a cause of action in ejectment even before the running of the applicable statute of limitations. Although these doctrines were often based on theories of implied ratification, they were most often enforced in circumstances indicating undue or prejudicial delay.[9]

---

[9] In *Brazee* v. *Schofield*, 124 U. S. 495 (1888), the Court rejected the claim in ejectment of a person seeking to avoid a conveyance made by a minor during his infancy:

"For eleven years after [the minor] became of age he made no objection to the proceedings, or by any act indicated his intention to disaffirm the sale or deed . . . ; and [only then] he gave to the grantors of the [plaintiffs] a deed of his interest in the . . . claim. In the meantime, the property had greatly increased in value by the improvements put upon it by the purchaser . . . . Under these circumstances, . . . the long acquiescence of the minor, after he became of age, in the proceedings had for the sale of his property, was equivalent to an express affirmance of them, even were they affected with such irregularities as, upon his prompt application after becoming of age, would have justified the court in setting them aside." *Id.,* at 504–505.

See also *Irvine* v. *Irvine*, 9 Wall. 617 (1870); *Tucker* v. *Moreland*, 10 Pet. 58 (1836). See generally 1 L. Jones, Real Property §§ 24–26 (1896); 1 J. Kent, Commentaries on American Law 252–255 (8th ed. 1854); 1 R. Powell, Real Property ¶ 125, p. 483 (1984); 6 G. Thompson, Real Property § 2946, pp. 30–31; § 2951, pp. 63–64 (1962); cf. 2 J. Pomeroy, Equity Jurisprudence § 965 (1886).

Similar doctrines have been applied in the Indian area. For example, in *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339 (1941), the Court held that the acceptance by the Walapais Indians of reservation lands "must be regarded in law as the equivalent of a release of any tribal rights which they may have had in lands outside the reservation. They were in substance acquiescing in the penetration of white settlers on condition that permanent provision was made for them too. In view of this historical setting, it cannot now be fairly implied that tribal rights of the Walapais in lands outside the reservation were preserved. . . . Hence, acquiescence in that arrangement must be deemed to have been a relinquishment of tribal rights in lands outside the reservation and notoriously claimed by others." *Id.*, at 358. See also *Mitchel* v. *United States*, 9 Pet. 711, 746 (1835)

I believe that the equitable doctrine of laches,[10] with its focus on legitimate reliance and inexcusable delay, best reflects the limitation principles that would have governed this ancient claim at common law—without requiring a historian's inquiry into the archaic limitation doctrines that would have governed the claims at any specific time in the preceding two centuries. Of course, the application of a traditional equita-

("*Indian possession or occupation was considered with reference to their habits and modes of life;* their hunting-grounds were as much in their actual possession as the cleared fields of the whites; and their rights to its exclusive enjoyment in their own way, and for their own purposes were as much respected, *until they abandoned them,* made a cession to the government, or an authorized sale to individuals. *In either case their right became extinct . . .*") (emphasis added); *Williams* v. *City of Chicago,* 242 U. S. 434, 437 (1917) ("If in any view [the Pottawatomie Nation] ever held possession of the property here in question, *we know historically that this was abandoned long ago* and that for more than a half century [the tribe] has not even pretended to occupy either the shores or waters of Lake Michigan within the confines of Illinois") (emphasis added). Cf. H. R. Doc. No. 1590, 63d Cong., 3d Sess., 11 (1915) (The Oneida sold most of their lands to the State, and divided the remaining lands in severalty; "as a tribe these Indians are known no more in that State").

[10] In their petition for certiorari, the counties raised the general question of what federal time bar should apply to this litigation in asking the Court to decide "Whether, in any case, respondent's claim is barred because it was not brought until 175 years after the conveyance." Pet. for Cert. of Counties, Question 2. The possibility that laches might apply to the claim is fairly included within that question. The laches question was fully litigated in the trial court—the testimony of four of the six witnesses appearing on the Oneida's behalf in the liability phase of the trial was presented solely to avoid the obvious defense of laches. Record Doc. No. 37, pp. 196–276. The Court of Appeals' rejection of delay-based defenses, 719 F. 2d 525, 538 (CA2 1983), will remain the law of the Circuit until it is reversed by this Court, and will no doubt apply to the numerous Indian claims pending in the lower courts, see cases cited in Brief for Respondent Counties in No. 83–1240, p. 10, and n. 8. Discussion of the applicability of equitable limitations or laches appears in the briefs, Reply Brief for Petitioner Counties in No. 83–1065, pp. 19–20; Brief for United States as *Amicus Curiae* 33–40; Brief for City of Escondido et al. as *Amici Curiae* 21–29, and occurred at oral argument. Tr. of Oral Arg. 61–65.

ble defense in an action at law is something of a novelty. But this novel development in litigation involving Indian claims arose in order to benefit a special class of litigants, and it remains true that an equitable defense to the instant claim is less harsh than a straightforward application of the limitations rule dictated by our usual practice. At least equal to the maxim that equity follows the law is the truth that common-law real property principles were often tempered by equitable considerations—as the rules limiting a ward's power to avoid an unlawful conveyance demonstrate.[11]

As the Court recognizes, the instant action arises under the federal common law, not under any congressional enactment, and in this context the Court would not risk frustrating the will of the Legislature[12] by applying this familiar doctrine of equity. The merger of law and equity in one federal court[13] is, of course, primarily procedural. Considering the hybrid nature of these claims and the evolving character of the common law, however, I believe that the application of laches as a limitation principle governing ancient Indian claims will promote uniformity of result in law and at equity, maintain the proper measure of flexibility to protect the legitimate interests of the tribes, while at the same time honoring the historic wisdom in the value of repose.

---

[11] In fact, the idea that the State should protect persons suffering from disabilities who had no other lawful protector probably arose at equity where the Chancery Courts exercised the prerogatives of the King as *parens patriae*, 3 J. Story, Equity Jurisprudence § 1748 (14th ed. 1918), and applied theories of constructive fraud, 2 J. Pomeroy, Equity Jurisprudence § 943 (1886).

[12] In deference to the doctrine of the separation of powers, the Court has been circumspect in adopting principles of equity in the context of enforcing federal statutes. See generally *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305 (1982); *TVA* v. *Hill*, 437 U. S. 153 (1978); *Hecht Co.* v. *Bowles*, 321 U. S. 321 (1944); Plater, Statutory Violations and Equitable Discretion, 70 Calif. L. Rev. 524, 592 (1982).

[13] *E. g.*, Fed. Rules Civ. Proc. 1, 2.

## II

Three decisions of this Court illustrate the application of the doctrine of laches to actions seeking to set aside conveyances made in violation of federal law. In *Ewert* v. *Bluejacket*, 259 U. S. 129 (1922), the Court stated that "the equitable doctrine of laches . . . cannot properly have application to give vitality to a void deed and to bar the rights of Indian wards in lands subject to statutory restrictions." *Id.*, at 138. A close examination of the *Ewert* case, however, indicates that the Court *applied* the doctrine of laches, but rejected relief for the defendant *in the circumstances of the case.*

In 1909, Ewert, a federal Indian agent, obtained a conveyance of allotted lands from the heirs of an Indian in violation of a statutory prohibition against federal officers engaging in trade with Indians. In 1916, the heirs brought an action, in equity, seeking to set aside the conveyance. The Court of Appeals held that the heirs had the burden of disproving laches because they had brought their action outside the applicable state statute of limitations, and concluded that they had not satisfied this burden. "The adult plaintiffs were free to make conveyance of this land, even though they were Indians, and [since] their tribal relations had been severed, [they] were chargeable with the same diligence as white people in discovering and pursuing their legal remedies. [*Felix* v. *Patrick*, 145 U. S. 317 (1892)]; [*Schrimpscher* v. *Stockton*, 183 U. S. 290 (1902)]." *Bluejacket* v. *Ewert*, 265 F. 823, 829 (CA8 1920).

On appeal, this Court held that the plaintiffs' action was not barred by the doctrine of laches, noting that "[Ewert] still holds the legal title to the land." 259 U. S., at 138. The Court principally relied on the doctrine that "an [unlawful] act . . . is void and confers no right *upon the wrongdoer.*" *Waskey* v. *Hammer*, 223 U. S. 85, 94 (1912) (emphasis added). On the facts of *Ewert*, the Court found that the

plaintiffs' burden of disproving laches was easily met, but the Court might well have reached a different conclusion in *Ewert* if the conveyance had not been so recent, if the defendant had not been as blameworthy, or if the character of the property had changed dramatically in the interim.

My interpretation of *Ewert* is illustrated by this Court's prior decision in *Felix* v. *Patrick*, 145 U. S. 317 (1892). In that case, the Court applied the doctrine of laches to bar an action by the heirs of an Indian to establish a constructive trust over lands that had been conveyed by her in violation of a federal statutory restriction. The action to set aside the unlawful transfer was brought 28 years after the transaction, and in the intervening time, "[t]hat which was wild land thirty years ago is now intersected by streets, subdivided into blocks and lots, and largely occupied by persons who have bought upon the strength of Patrick's title, and have erected buildings of a permanent character upon their purchases." *Id.*, at 334.

The Court recognized that the long passage of time, the change in the character of the property, the transfer of some of the property to third parties, the absence of any obvious inadequacy in the consideration received in the original transaction, and Patrick's lack of direct participation in the original transfer all supported a charge of laches against the plaintiffs. In addition, the Court noted that "[t]he decree prayed for in this case, if granted, would offer a distinct encouragement to the purchase of similar claims, which doubtless exist in abundance through the Western Territories, . . . and would result in the unsettlement of large numbers of titles upon which the owners have rested in assured security for nearly a generation." *Id.*, at 335.

Nor is *Felix* the only application of these principles in a similar context. In *Wetzel* v. *Minnesota Railway Transfer Co.*, 169 U. S. 237 (1898), the children of a deceased Mexican War veteran received a warrant for 160 acres of land under a federal statute that prohibited any alienation of the property without the approval of the proper state probate court. The

children's guardian sold their share in the warrant without seeking the approval of the proper court. Forty-four years after the conveyance, the children brought an action, in equity, seeking to establish a constructive trust over the 160 acres—now located in a well-developed area of St. Paul, Minnesota. The Court held that the action was barred by laches relying on *Felix* v. *Patrick*, and noting that the property had been completely developed and had greatly increased in value. The Court also observed that title had passed to persons who were no doubt ignorant of the defect in title.

The Court also noted the relevance of the length of the delay:

> "While the fact that the complainants were ignorant of the defect in the title and were without means to prosecute an investigation into the facts may properly be considered by the court, it does not mitigate the hardship to the defendants of unsettling these titles. *If the complainant may put forward these excuses for delay after thirty years, there is no reason why they may not allege the same as an excuse after a lapse of sixty. The truth is, there must be some limit of time within which these excuses shall be available, or titles might forever be insecure.* The interests of public order and tranquillity demand that parties shall acquaint themselves with their rights within a reasonable time, and although this time may be extended by their actual ignorance, or want of means, it is by no means illimitable." 169 U. S., at 241 (emphasis added).

*Ewert, Felix,* and *Wetzel* establish beyond doubt that it is quite consistent with federal policy to apply the doctrine of laches to limit a vendor's power to avoid a conveyance violating a federal restriction on alienation.

## III

As in *Felix* and *Wetzel*, the land conveyed by the Oneida in 1795 has been converted from wilderness to cities, towns,

villages, and farms. The 872 acres of land involved in the instant action include the principal transportation arteries in the region, and other vital public facilities owned by the Counties of Oneida and Madison.[14] The counties and the private property owners affected by the litigation, without proven notice of the defect in title caused by the State of New York's failure to comply with the federal statute, have erected costly improvements on the property in reliance on the validity of their title. Even if the counties are considered for some purposes to be the alter ego of the State, it is surely a fiction to argue that they are in any way responsible for their predicament,[15] or that their taxpayers, who will ultimately bear the burden of the judgment in this case, are in any way culpable for New York's violation of federal law in 1795.

As the Court holds, *ante*, at 233–236, there was no *legal* impediment to the maintenance of this cause of action at any time after 1795. Although the mere passage of time, without other inequity in the prosecution of the claim, does not support a finding of laches in the ordinary case, *e. g.*, *Holmberg* v. *Armbrecht*, 327 U. S., at 396, in cases of *gross* laches the passage of a great length of time creates a nearly insurmountable burden on the plaintiffs to disprove the obvious defense of laches.[16] As Justice Story noted for the Court in *Prevost* v. *Gratz*, 6 Wheat. 481, 504–505 (1821):

---

[14] Partial Findings of Fact and Conclusions of Law (Oct. 5, 1981), App. 148a–153a.

[15] *Id.*, at 151a ("The counties of Madison and Oneida, New York, were not in existence in 1795 at the time of the transaction complained of in this action. No evidence has been presented to show that the Counties . . . acted other than in good faith when they came into possession of the County Land in the claim area subsequent to 1795 and prior to January 1, 1968").

[16] See, *e. g.*, *French Republic* v. *Saratoga Vichy Spring Co.*, 191 U. S. 427, 436–437 (1903) (25-year delay); *Clarke* v. *Boorman's Executors*, 18 Wall. 493, 509 (1874) (40-year delay); *Badger* v. *Badger*, 2 Wall. 87, 94–95 (1864) (28-year delay); *Wagner* v. *Baird*, 7 How. 234, 258–259 (1849)

"[G]eneral presumptions are raised by the law upon subjects of which there is no record or written instrument, not because there are the means of belief or disbelief, but because mankind, judging of matters of antiquity from the infirmity and necessity of their situation must, for the preservation of their property and rights, have recourse to some general principle, to take the place of individual and specific belief, which can hold only as to matters within our own time, upon which a conclusion can be formed from particular and individual knowledge." *Id.*, at 504–505.

Given their burden of explaining nearly two centuries of delay in the prosecution of this claim, and considering the

---

(46-year delay); *Bowman* v. *Wathen*, 1 How. 189, 195 (1843) (38-year delay); *Piatt* v. *Vattier*, 9 Pet. 405, 416–417 (1835) (30-year delay); see also 3 J. Story, Commentaries on Equity Jurisprudence 553 (1918) ("Courts of Equity act sometimes by analogy to the law, and sometimes act upon their own inherent doctrine of discouraging for the peace of society antiquated demands by refusing to interfere where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights"); cf. *Saratoga Vichy Spring Co.* v. *Lehman*, 625 F. 2d 1037, 1041 (CA2 1980) (69-year delay); *Anheuser-Busch, Inc.* v. *Du Bois Brewing Co.*, 175 F. 2d 370, 374 (CA3 1949) (in hypothetical lapse of 100 years "highly dubious" whether plaintiff could prevail), cert. denied, 339 U. S. 934 (1950).

In deciding territorial disputes arising under this Court's original jurisdiction, similar principles have frequently been applied:

"No human transactions are unaffected by time. Its influence is seen on all things subject to change. And this is peculiarly the case in regard to matters which rest in memory, and which consequently fade with the lapse of time, and fall with the lives of individuals. For the security of rights, whether of states or individuals, long possession under a claim of title is protected." *Rhode Island* v. *Massachusetts*, 4 How. 591, 639 (1846).

See also *California* v. *Nevada*, 447 U. S., at 132 ("If Nevada felt that those lines were inaccurate and operated to deprive it of territory lawfully within its jurisdiction the time to object was when the surveys were conducted, not a century later"); *Ohio* v. *Kentucky*, 410 U. S., at 648–651; *Indiana* v. *Kentucky*, 136 U. S. 479, 509–510 (1890).

legitimate reliance interests of the counties and the other property owners whose title is derived from the 1795 convey-ance, the Oneida have not adequately justified their delay.

Of course, the traditional rule was "that 'the conduct of Indians is not to be measured by the same standard which we apply to the conduct of other people.' But their very anal-ogy to persons under guardianship suggests a limitation to their pupilage, since the utmost term of disability of an infant is but 21 years, and it is very rare that the relations of guard-ian and ward under any circumstances, even those of lunacy, are maintained for a longer period than this." *Felix* v. *Patrick*, 145 U. S., at 330–331 (quoting *The Kansas Indians*, 5 Wall. 737, 758 (1867)). In this case, the testimony at trial indicates that the Oneida people have independently held land derived from tribal allotments at least since the Dawes Act of 1887,[17] and probably earlier in the State of New York.[18] They have received formal schooling at least since 1796 in New York, and have gradually become literate in the English language.[19] They have developed a sophisticated system of tribal government,[20] and at various times in the past 175 years, have petitioned the Government for the redress of grievances, or sent commissions to confer with their brethren.[21]

---

[17] General Allotment Act, 24 Stat. 388.

[18] Record Doc. No. 37, p. 227.

[19] *Id.*, at 210, 264. In 1948, the Secretary of the Wisconsin Oneida testi-fied before a Senate Subcommittee that nearly all of the members of the Tribe could speak English fluently, although a few of the older members of the Tribe could not read and write. Hearings on S. 1683 before a Sub-committee of the Senate Committee on Interior and Insular Affairs, 80th Cong., 2d Sess., 41 (1948). At least into the 1950's, however, translators were required at general meetings to explain complicated actions of the Federal Government. Record Doc. No. 37, p. 225.

[20] The Wisconsin Oneida, for example, have been incorporated since 1937, *id.*, at 207, 211–212, with a Constitution, bylaws, and a governing "Business Committee" which is elected by the tribal members. *Id.*, at 211–212. See also *id.*, at 37–41.

[21] In 1874, for example, a party of Wisconsin Oneida traveled to Albany, New York, to confer with a private law firm and members of the New York

In all the years after the 1795 conveyance—until the years leading up to this litigation—the Oneida made few efforts to raise this specific grievance against the State of New York and the landowners holding under the State's title.[22] Claims to lands in New York most often were only made in connection with generalized grievances concerning the Tribe's treatment at the hands of the United States Government.[23] Although the Oneida plainly knew or should have known that they had conveyed their lands to the State of New York in violation of federal law, and that they might have some cause for redress, they inexplicably delayed filing a lawsuit on their claim until 175 years after the conveyance was made. Finally, "[t]here is no evidence that any of the plaintiffs or their predecessors ever refused or returned any of the payments received for the purported sale of land pursuant to the Treaty of 1795."[24]

---

Tribe about viable alternatives of protest against the Federal Government. *Id.*, at 237–238. The record contains numerous petitions and letters from the Tribe and tribal members in this century seeking the Government's assistance in resolving miscellaneous problems concerning treaty rights, real property ownership, and Government entitlement programs. See Record Ex. Nos. 54, 55.

[22] See, *e. g.*, Record Ex. No. 54 (1909 correspondence).

[23] Although there was much anger, resentment, and bitterness among the Oneida in the 19th century concerning their treatment by the United States, "conditions were being protested, but there was no specification of this particular treaty in the protest." Record Doc. No. 37, p. 248. No specific action was taken to enforce this claim in a court of law until 1951 when the Oneida filed a petition against the United States before the Indian Claims Commission seeking judgment against the United States, as trustee, for the fair market value of the Oneida lands sold to the State of New York since the 18th century. See App. 43a.

[24] Partial Conclusions of Law, App. 152a. There is also a serious question whether the Oneida did not abandon their claim to the aboriginal lands in New York when they accepted the Treaty of Buffalo Creek of 1838, which ceded most of the Tribe's lands in Wisconsin to the United States in exchange for a new reservation in the Indian Territory. The Treaty provided that the new reservation lands were to provide "a permanent home for all the New York Indians, now residing in the State of New York, *or in* Wisconsin, or elsewhere in the United States, who have no permanent

The Oneida have not met their formidable burden of disproving unjustifiable delay to the prejudice of others. In my opinion their cause of action is barred by the doctrine of laches. The remedy for the ancient wrong established at trial should be provided by Congress, not by judges seeking to rewrite history at this late date.

## IV

The Oneida argue that the legislative histories of a series of congressional enactments, beginning in 1952, persuasively establish that their claims have never been barred. This argument has serious flaws, not the least being that whatever Congress said in 1952 or 1966 is extremely weak authority for the status of the common law in 1795, or for a considerable period thereafter. Believing, as I do, that the Oneida's claim was barred by the doctrine of laches or by a related common-law doctrine[25] long before 1952, it is quite clear that the statutes discussed by the Court did not revive it.

First, and most obviously, the principal statute relied on by the Court, by its very terms, only applies to claims brought *by the United States* on behalf of Indians or Indian tribes.[26] This

---

homes." 7 Stat. 551, Art. 2. "These proceedings, by which these tribes divested themselves of their title to lands in New York, indicate an intention on the part, both of the Government and the Indians, that they should take immediate possession of the tracts set apart for them in Kansas." *New York Indians* v. *United States,* 170 U. S. 1, 21 (1898). Cf. *United States* v. *Santa Fe R. Co.,* 314 U. S., at 358; n. 9, *supra.*

[25] See n. 9, *supra.*

[26] For example, the relevant portion of 28 U. S. C. § 2415(b) provides: "That an action to recover damages resulting from a trespass on lands of the United States; . . . may be brought within six years after the right of action accrues, except that *such* actions *for or on behalf of a recognized tribe, band, or group of American Indians,* . . . which accrued [prior to the date of enactment of this Act but under subsection (g) are deemed to have accrued on the date of enactment of this Act] may be brought on or before sixty days after the date of the publication of the list required by . . . the Indian Claims Act of 1982: Provided, That, for *those* claims that are on either of the two lists published pursuant to the Indian Claims Act of 1982,

action, of course, is brought by an Indian Tribe *on its own behalf.*

Secondly, neither the statutes themselves,[27] nor the legislative discussions that preceded their enactment,[28] provide

---

*any* right of action shall be barred unless the complaint is filed within (1) one year after the Secretary of the Interior has published in the Federal Register a notice rejecting such claim . . ." (emphasis added).

The Court relies on the word *"any"* in the final clause of the statute and construes this as implicitly providing a federal statute of limitations for causes of action brought by Indian tribes *on their own behalf,* notwithstanding the unmistakable references throughout the statute and its legislative history to claims brought by the United States *on behalf of Indians.* See, *e. g.,* H. R. Rep. No. 96–807, p. 2 (1980); H. R. Rep. No. 92–1267, pp. 2–3 (1972); S. Rep. No. 1328, 89th Cong., 2d Sess., 8–9 (1966); 126 Cong. Rec. 3289 (1980) (remarks of Sen. Melcher); *id.,* at 3290 (remarks of Sen. Cohen); *id.,* at 5745 (remarks of Rep. Clausen); 123 Cong. Rec. 22499 (1977) (remarks of Rep. Cohen); *id.,* at 22507 (remarks of Rep. Dicks); *id.,* at 22509 (remarks of Rep. Studds); *id.,* at 22510 (remarks of Rep. Udall); *ibid.* (remarks of Rep. Yates). Even if the Court's construction were correct, it does not establish that Congress intended to *revive* previously barred causes of action.

[27] Each of the statutes is phrased in a form indicating an intention to preserve the law as it existed on the date of passage. See, *e. g.,* 25 U. S. C. § 233 (*"[N]othing herein contained shall be construed* as conferring jurisdiction on the courts of the State of New York or making applicable the laws of the State of New York in civil actions involving Indian lands or claims with respect thereto which relate to transactions or events transpiring prior to September 13, 1952") (emphasis added); 28 U. S. C. § 2415(c) (*"[N]othing herein shall be deemed* to limit the time for bringing an action to establish the title to, or right of possession of, real or personal property") (emphasis added).

[28] The comments of Representative Morris concerning the meaning of the proviso contained in 25 U. S. C. § 233, reflect an intent to *"preserve* their rights,"* 96 Cong. Rec. 12460 (1950). The proviso was designed to preserve an "impartial" federal forum for resolving pre-existing Indian land claims and to ensure that federal law would be applied in deciding them. See *Oneida Indian Nation* v. *County of Oneida,* 414 U. S. 661, 680–682 (1974). The application of laches as a federal doctrine of limitation in a federal forum is entirely consistent with this view.

As for § 2415 and its various amendments since 1966, the record is barren of any reference to revival. At most, Congress was of the view that

any indication of an intent to *revive* already barred claims.[29] Quite the contrary, they merely indicate a congressional intent to preserve the status quo with respect to ancient claims that might already be barred, and to establish a procedure for making sure that the claims would not survive eternally.

Congress, for the most part, has been quite clear when it decides to revive causes of action that might be barred or to deny any time limitation for a private cause of action.[30] When the will of Congress is as lacking in clarity as it is in this case, we should be wary of attributing to it the intention of reviving ancient claims that will upset long-settled expectations. In divining the intent of Congress concerning the applicable limitation on a cause of action, Chief Justice Marshall once noted that "it deserves some consideration," that in the absence of an applicable limitation, "those actions might, in many cases, be brought at any distance of time. This would be utterly repugnant to the genius of our laws." *Adams* v. *Woods*, 2 Cranch 336, 341 (1805). The Court

---

nothing in § 2415 would "preclude" actions by the tribes themselves. See, *e. g.*, 123 Cong. Rec. 22499 (1977) (remarks of Rep. Cohen). It may very well be that in view of the hospitable treatment that these ancient claims received in the lower federal courts, some Members of Congress may have *assumed* that there was no time bar to such actions. In the absence of legislation, however, the assumptions of individual Congressmen about the status of the common law are not enacted into positive law. In enacting the Indian Claims Limitation Act of 1982, Pub. L. 97–394, 96 Stat. 1976, note following 28 U. S. C. § 2415, Congress simply provided a *procedure* for exhausting the Federal Government's responsibility, as trustee, for prosecuting meritorious claims—leaving this Court ultimately to decide whether claims brought by the tribes themselves were still alive.

[29] Indeed, if the statutes had that effect, the Court would have to resolve the question of their constitutionality. Cf. *Stewart* v. *Keyes*, 295 U. S. 403, 417 (1935).

[30] *E. g.*, 25 U. S. C. § 640d–17(b) ("Neither laches nor the statute of limitations shall constitute a defense to any action authorized by this subchapter for existing claims if commenced within two years from December, 22, 1974"); § 653 ("If any claim or claims be submitted to said courts, they shall settle the equitable rights therein, notwithstanding lapse of time or statutes of limitation"); see also *New York Indians* v. *United States*, 170 U. S., at 35.

today prefers to impute to Congress the intent of rewarding those whom "Abraham Lincoln once described with scorn [as sitting] in the basements of courthouses combing property records to upset established titles." *Arizona* v. *California,* 460 U. S. 605, 620 (1983). The more appropriate presumption in this case is that Congress intended to honor legitimate expectations in the ownership of real property and not to disturb them.

## V

The Framers recognized that no one ought be condemned for his forefathers' misdeeds—even when the crime is a most grave offense against the Republic.[31] The Court today ignores that principle in fashioning a common-law remedy for the Oneida Nation that allows the Tribe to avoid its 1795 conveyance 175 years after it was made. This decision upsets long-settled expectations in the ownership of real property in the Counties of Oneida and Madison, New York, and the disruption it is sure to cause will confirm the common-law wisdom that ancient claims are best left in repose. The Court, no doubt, believes that it is undoing a grave historical injustice, but in doing so it has caused another, which only Congress may now rectify.

I respectfully dissent.

---

[31] U. S. Const. Art. III, § 3, cl. 2 ("no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the person attainted"). Cf. *Adams* v. *Woods,* 2 Cranch 336, 341 (1805) ("In a country where not even treason can be prosecuted after a lapse of three years, it could scarcely be supposed that an individual would remain for ever liable to a pecuniary forfeiture").