THE ONEIDA INDIAN NATION OF NEW YORK; the Oneida Indian Nation of Wisconsin; and the Oneida of the Thames, Plaintiffs,

v.

THE COUNTY OF ONEIDA, NEW YORK, and the County of Madison, New York, Defendants.

No. 70–CV–35.

United States District Court, N.D. New York.

Aug. 29, 2002.

See also 719 F.2d 525.

Cravath Swaine Law Firm, New York City, Thomas D. Barr, of Counsel, Zuckerman Spaeder Law Firm, Attorneys for Oneida Indian Nation of New York State, Washington, D.C., William W. Taylor, of Counsel.

Arlinda Locklear, Jefferson, MD, for Oneida Tribe of Indians of Wisconsin.

Paul Weiss Law Firm, Attorneys for Plaintiff Oneida of The Thames Council, New York City, Carey R. Ramos, of Counsel.

Nixon Peabody Law Firm, Attorneys for County of Oneida, New York & County of Madison, New York, Rochester, NY, G. Robert Witmer, Jr., of Counsel.

### AMENDED MEMORANDUM & DECISION & ORDER

MCCURN, Senior District Judge.

#### Introduction

Through a series of treaties between 1795 and 1846, the State "divest[ed] the Oneidas [1] of all but a few hundred acres[ ]" of their extensive land holdings in central New York. *See Oneida Indian Nation of New York v. Oneida County,* 719 F.2d 525, 529 (2d Cir.1983) (*"Oneida IV"*), *aff'd in part, rev'd in part, on other grounds,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (*"Oneida V"*). On February 5, 1970, the Oneidas commenced the present action which is commonly referred to as the test case. This case was deemed the "test" case because it involves a mere 872 of the approximately 100,000 acres of the Oneida reservation which had been created by the 1795 treaty, and the Oneidas are seeking very limited damages—the fair rental value of that property for only two years—1968 and 1969.

During the course of more than 30 years of litigation, this case has twice been before the Supreme Court. In *Oneida Indian Nation v. Oneida County,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (*"Oneida II"*), the Supreme Court unanimously held that federal courts have jurisdiction over land claims because Indian title is a matter of federal law. Once that jurisdictional barrier was removed, in 1977 United States District Judge Edmund Port unequivocally held that the Oneidas had "established a claim for violation of the Nonintercourse Act[.]" *Oneida Indian Nation of New York v. County of Oneida,* 434 F.Supp. 527, 548 (N.D.N.Y.1977) (*"Oneida III"*). Reasoning that otherwise the Nonintercourse Act would "be rendered nugatory," Judge Port "concluded that the [Oneidas'] right of occupancy and possession to the land in question was not alienated[.]" *Id.* (footnote omitted). Thus, "[b]y the deed of 1795, the State acquired no rights against the [Oneidas]; consequently, its successors, the defendant counties, are in no better position." *Id.*

With liability resolved, in 1981, Judge Port held a separate damages hearing finding that Madison County was liable to the Oneidas for $9,060.00, which represents two years of damages for that County's unlawful occupancy of the Champlain Battleground Park ("the Park") and the land upon which a radio tower is situated. *See* Plaintiffs' Memorandum on the Good Faith Issue ("Pl.Memo."), exh. 1 thereto (Tr. (10/05/81)) ("Pl.exh. 1") at 172a. Judge Port further held that Oneida County was liable to the Oneidas for $7,634.00, which represented the two years of damages which the Oneidas sustained as a result of that County's unlawful occupation of the gravel pit. *See id.* at 173a. Judge Port also ordered the Counties to pay interest on those damages awards at a rate of six percent per annum from January 1, 1968, "adopting New York Law of Interest as it relates to claims and [j]udgments against counties[.]" *Id.* at 174a. In 1983, the Second Circuit affirmed on the issue of liability "but remand[ed] for further pro-

---

**1.** The "Oneidas" refers to the three tribal plaintiffs herein: the Oneida Indian Nation of New York, the Oneida Indian Tribe of Wisconsin, and the Oneida of the Thames.

ceedings on the calculation of damages." *See Oneida IV,* 719 F.2d at 527.

The Supreme Court, in 1985, in its second *Oneida* opinion, affirmed the Counties' liability, expressly holding "that the Oneidas can maintain this action for violation of their possessory rights based on federal common law." *Oneida V,* 470 U.S. at 236, 105 S.Ct. at 1252. In *Oneida V* the Supreme Court removed many procedural barriers to this land claim litigation, further holding that the Oneidas' federal common law claims for violation of their possessory rights were not barred by the statute of limitations, laches, abatement, ratification or the doctrine of justiciability. *See id.* at 240–50, 105 S.Ct. at 1254–60. On remand from the Supreme Court, consistent with *Oneida IV,* the Second Circuit reaffirmed Judge Port's liability finding, and "remand[ed] for further proceedings to determine the good faith claims of the Counties as they bear on any set-off for improvements made on the property, and for recomputation of damages[.]" Doc. # 23 (Second Circuit Mandate (4/4/85) at 2).

Following remand, in June, 1985, the present action was reopened and reassigned to this court. In early 1986, pursuant to the court's directive, the parties submitted proposals as to how this matter should proceed on remand. After considering those proposals, the court ordered the parties to file memoranda of law and fact concerning, among other things, "the good faith claims of the defendant Counties and the legal standards to be applied by the court in making a decision relative thereto." Doc. # 28 (7/17/86 Order) at 2. At that time the court held in abeyance the presentation of any additional evidence.

*See id.* In the fall of 1986, the parties filed those submissions but in early 1987 they requested a stay pending settlement negotiations, and the court granted that request.

After nearly a decade of unproductive settlement efforts, in 1998 the court lifted that stay and held a status conference. During that conference, the court allowed the parties to "supplement[ ]" their prior, 1986 submissions. *See* Doc. # 48 (Tr. 9/2/98) at 25. That has now been done, with the filing of additional memoranda of law and augmentation of the record with additional exhibits.

### Background

Assuming familiarity with the lengthy and circuitous history of this historic litigation, the court sees no need for an exhaustive review of the same at this juncture.[2] However, because the present action is now before this court explicitly for "clarification of the issue of good faith[,]" *vis-a-vis* defendants' improvements to the subject property, and to recalculate the damages for highway lands, *see Oneida IV,* 719 F.2d at 542, it is necessary to review in some detail both Judge Port's 1981 decision on damages, as well as the damages aspect of *Oneida IV.*

### I. Judge Port's Decision

In rendering his decision on damages, Judge Port opined that his 1977 *Oneida III* decision that the Counties were liable to the Oneidas, "was of much greater importance in the context of the entire [land claim] problem than the number of dollars that happened to be awarded." Pl. exh. 1 at 156a. While that may be so, after more than three decades of litigation the parties

---

2. A fairly detailed discussion of the historical background of this landmark case can be found in the Second Circuit's *Oneida IV* decision. *See Oneida IV,* 719 F.2d at 527–30; *see*

*also* IROQUOIS LAND CLAIMS 141–53 (Christopher Vecsey & William A. Starna eds., 1988).

still are arguing about the amount of the damage award.

Part of the difficulty is that the 1793 Nonintercourse Act did not "establish a comprehensive remedial plan for dealing with violations of Indian property rights[;]" nor did it "address directly the problem of restoring unlawfully conveyed land to the Indians[.]" *See Oneida V,* 470 U.S. at 237 and 239, 105 S.Ct. at 1253 and 1254 (citation omitted). And even though the Supreme Court's two *Oneida* decisions opened federal courts to Indian land claims, those decisions gave no guidance in terms of the relief which should be awarded. Perhaps this lack of guidance is why the parties have taken "extreme positions" regarding damages in this case. Pl. exh. 1 at 159a.

In accordance with *Oneida II,* the parties agree that the court must apply the federal common law, but "[t]hey differed greatly[,]" and still do, as to how to fashion that common law. *See id.* The parties agree that "the principal objective ... should be the vindication of Federal preeminence in Indian affairs[.]" *Id.* at 160a. The Oneidas maintain that "vindication requires awarding the highest possible damages as rent computed on the basis of the occupied land *with the improvements* as they existed in 1968 and 1969[,]" and with the profits derived therefrom. *See id.* at 160a (emphasis added). The Counties' supposed bad faith is the fundamental premise supporting this claimed entitlement to such "large damages[.]" *See id.* at 166a. On the other end of the spectrum, the Counties' posit that vindication requires that the Oneidas recover "no relief whatsoever[.]" *See id.* at 160a (internal quotation marks omitted).

Quoting from Gilbert and Sullivan's "The Mikado," when fashioning the relief herein, Judge Port attempted to " 'let the punishment fit the crime.' " *See id.* at 166a.[3] In so doing, Judge Port recognized the limited power of district courts to "refashion[ ] what appears to be existing law by reason of contemporary times or conditions." *Id.* at 164a. "That luxury," Judge Port noted, "resides solely in the Supreme Court of the United States." *Id.*

Struggling admirably with the parties' divergent damage theories, Judge Port began his analysis by acknowledging the applicability of a federal common law, and further "recogniz[ing] that good faith is *not* a defense to a common-law action for damages for unlawful use and occupancy of land." *Id.* at 161a; and 164a (emphasis added). Judge Port was equally quick to point out though that "even under the oldest cases [the common-law recognized that] a good-faith occupier [of land] was permitted to offset the value of the improvements against the damages[.]" *Id.* at 166a (citing *Green v. Biddle,* 8 Wheat. 1, 21 U.S. 1, 5 L.Ed. 547 (1823)). The Oneidas maintained that because the State was not a good faith occupier of the land due to its violation of the Nonintercourse Act, then the Counties, as "successors in the chain of title to the State[,]" also could not be deemed good faith occupiers. *See id.* Disagreeing, the Counties argue[d] that "[t]here is no bad faith and they do [not] succeed to the [State's] bad faith[.]" *Id.* Simply put, according to the Counties, "the sins of the State do *not* fall on the Counties ... under these facts." *Id.* at 162a (emphasis added).

"[I]nclin[ing] to agree with that defense argument", Judge Port declared that "in-

---

**3.** My object all sublime
I shall achieve in time,
To let the punishment fit the crime,
The punishment fit the crime.

W. Gilbert & A. Sullivan, *My Object All Sublime, in a Treasury of Gilbert and Sullivan* 284 (Simon & Schuster eds., 1941).

sofar as the *right to occupancy* is concerned and no matter what, ..., [it is not] necessary to treat the [C]ounties as bad-faith *occupiers* for the purpose of assessing and fixing damages." *Id.* at 167a (emphasis added). Judge Port was clear: "[*t*]*he bad faith* consisted of the violation of the Non–Intercourse Act *by the State of New York.*" *Id.* (emphasis added). Moreover, "there [was] no evidence to connect" the Counties to the State's bad faith. *See id.* Further, Judge Port held that there was no evidence "indicating that the[ ] [Counties] were bad-faith occupiers of the land in 1968 or 1969[ ]"—the only two years for which the Oneidas are seeking damages herein. *Id.* In fact, he noted that there was not even any "evidence as to *when or how* the [C]ounties acquired this land." *Id.* (emphasis added).

Turning to the damage evidence itself, Judge Port picturesquely described much of it as taking "on the aspect[ ] of how many angels can dance on the point of a pin[.]" *Id.* at 170a. Nonetheless, at the end of the day he was able to set a dollar amount for the years 1968–69 for the Oneidas' loss of the occupancy of a small portion of their original home land. In arriving at that amount, Judge Port quickly dismissed the Counties' argument that there must be deducted from any damages awarded to the Oneidas "other monies [the Oneidas] have received ... including" for their use "of the roads and other public facilities[ ]" located on the subject property. *Id.* at 165a. Chiding the Counties somewhat, Judge Port likened this to a situation where "most of us could use these [C]ounty roads ... without paying anything[,]" but "[a]s far as the [Oneidas] are concerned, they become a toll road[.]" *See id.*

Judge Port calculated the fair "rental value less improvements" by determining "the fair rental value of the land as *un*

improved for the years 1968 and 1969." *See Oneida IV,* 719 F.2d at 540 (emphasis added). Implicit in that valuation methodology is the assumption that the Counties occupied and improved the land in good faith. *See id.* In other words, by valuing the property as unimproved, although unstated, Judge Port effectively allowed the Counties a set-off for the improvements which they made thereon.

## II. *Oneida IV*

On appeal the parties did not challenge Judge Port's method of calculating damages. *See id.* at 541. Thus, as framed by the Second Circuit, "the *only dispute* [wa]s *whether* the *district court could set-off the value of improvements* against the fair rental value damages." *Id.* (emphasis added). "In challenging the district court's set-off for improvements against the fair rental value, the Oneidas argued that the common law rule applied by the district court 'would frustrate the purposes of the [Non–Intercourse] Act by rewarding trespassers and encouraging unlawful alienations and occupations.'" *Cayuga Indian Nation of New York v. Pataki,* No. 80–CV–930, 80–CV–960, 1999 WL 224615, at *13 (N.D.N.Y. April 15, 1999) ("*Cayuga VIII*") (quoting *Oneida IV,* 719 F.2d at 541). Disagreeing, the Second Circuit reasoned:

Presumably, the common law rule is based on the premise that to require forfeiture by the good-faith occupier of the value of its improvements would work an injustice and provide little in the way of added deterrence. A contrary rule would not discourage good faith trespassers from their illegal occupation because it is based on a mistaken, though still wrongful, belief of ownership.

*Oneida IV,* 719 F.2d at 541. Rejecting the Oneidas' argument, the Second Circuit further reasoned:

We are not prepared to require the good faith *non-active wrongdoers,* here a political subdivision, to forego the value of improvements it made in the absence of any policy benefits. If good faith occupiers were not credited with the value of their improvements, this would lead to the anomalous result that they usually would suffer higher damages than bad faith occupiers because good-faith occupants are more likely to make improvements.

*Id.* (emphasis added).

While the Second Circuit was unequivocal in finding that good faith occupiers should be credited with the value of improvements made thereon, it found more "troublesome" Judge Port's holding that the Counties held the subject property in good faith. *See id.* The Second Circuit was troubled by that holding because although "[t]he burden of proving good faith[ ] rests on the Counties[,]" in the Court's view the record was unclear upon which party Judge Port placed that burden. *See id.* at 541–42 (citations omitted). To demonstrate this ambiguity, the Second Circuit commented that "Judge Port ... merely state[d] that 'there is no evidence to connect the defendants, ... with [the State's] act of bad faith; nor is there any other evidence indicating that the[ ] [Counties] were bad-faith occupiers of the land in 1968 or 1969[—]' " the two years for which the Oneidas are seeking damages herein. *Id.*

Rather, as the Second Circuit remarked, "the Counties *only* proffered evidence that

they had been acting in good faith since 1970[ ]"—a year *after* the two year time frame for which the Oneidas are seeking compensation. *See id.* (emphasis added). "The Second Circuit questioned the sufficiency of that proof, declaring '[i]nasmuch as the Counties had possession of the Oneidas' land since sometime in the 1800s, it is not enough that they establish good faith since 1970[.]' " *See Cayuga VIII,* 1999 WL 224615, at *12 (citing *Oneida IV,* 719 F.2d at 541) (other citations omitted). The Court was silent, however, as to the time frame for which the Counties must establish that they were acting in good faith. Despite the foregoing, "[o]n the basis of the *present record,* ..., [the Second Circuit] w[as] not prepared to overturn Judge Port's determination that the Counties acted in good faith[,] instead leav[ing] clarification of th[at] issue ... to the district court on remand." *Oneida IV,* 719 F.2d at 542 (emphasis and footnote added).[4]

In addition to the good faith issue, on appeal the Oneidas also challenged Judge Port's calculation of the fair rental value of the highway lands. On that issue the Second Circuit "remand[ed] ... [for] calculat[ion][of] damages *without any discount* [,]" reasoning that calculating those damages, as did Judge Port, based on "the fair rental of 90% of the value of the property[ ] ... treat[ed] the Counties' occupation as if it were a lawfully obtained easement." *See Oneida IV,* 719 F.2d at 542. Holding that that discount was *not* "appropriate[,]" the Second Circuit explained that there was "no reason why there should be *any diminution* of the damages even if the

---

4. Perhaps part of the reason for "clarification" of the good faith issue was that evidently the full transcript from the four day damages hearing was not included in the record on appeal to the Second Circuit. Tr. (9/2/98)

at 22. Instead of having the entire 623 page transcript before it, the Second Circuit only had a "couple of extracts" therefrom—neither one of which dealt with the good faith issue. *Id.*

uses were for a public purpose." *Id.* (emphasis added).

### Discussion

In their post-remand submissions, the parties have focused almost exclusively upon the good faith inquiry with respect to the Counties' claimed offsets for improvements to the entire 871.92 acres at issue herein. The Counties' good faith or lack thereof is only germane to a relatively small portion of the property because, as outlined above, the Second Circuit treated highway improvements, the bulk of the property, differently from other improvements; and so too will this court.

### I. Highway Lands

Insofar as the highway lands are concerned, the Second Circuit was explicit. Judge Port improperly relied upon eminent domain concepts to discount by ten percent the fair rental value of such property, and on remand the damages for such lands should be calculated "*without any* discount." *See Oneida IV,* 719 F.2d at 542 (emphasis added). Thus, in accordance with that clear directive and as the parties agreed in early 1986 and evidently still agree, *see* Pl. Memo. at 3, n. 3; *see also* Tr. (9/2/98) at 24, the court finds that the full, fair rental value for the approximately 379 acres of property used as highways by Madison County in the years 1968 and 1969 is $9,910.00. *See id.,* exh. 2 thereto; *see also* Plaintiffs Oneida Indian Nations of Wisconsin and New York Proposal Respecting Proceedings on Remand (Jan. 7, 1986) at 2. For those same reasons, additionally the court finds that the "full fair rental value of the subject property used as Oneida County highways [approximately 430 acres] for the years 1968 and 1969" is $8,360. *See id.* Thus, the Oneidas are entitled to recover from the Counties a total of $18,270.00, which represents the full fair market rental value of that portion of the subject property located in the defendant Counties and used as highways during 1968 and 1969.

### II. Gravel Pit

Good faith also does not come into play with respect to the approximately 13 acres comprised of the gravel pit because in calculating the fair market value of same, the Oneidas' expert viewed it as *un*improved. *See* Pl. memo. at 2, n. 2 (citing Pl. exh. 1). Consequently, Judge Port's finding as to the damages the Oneidas sustained due to Oneida County's use and occupancy of the gravel pit, $7,634.00, stands with no modifications or clarifications necessary.

### III. Good Faith

Good faith simply is not an issue with respect to the majority of the subject property, as the foregoing discussion makes clear. It is an issue, however, as to the 47.22 acres which comprise the Park and the 2.07 acres upon which a fire department radio tower sits. There is more than a little irony to the fact that at the end of the day good faith is relevant to such an insignificant portion of the property which is the subject of this test case. That does not diminish the potential importance of this issue though, especially considering that good faith may well become an issue in other land claim cases involving vastly more land and a great many more improvements than those at issue herein.

After *Oneida IV* there is no doubt that the burden of proving good faith is on the Counties, *see Oneida IV,* 719 F.2d at 541–42 (citations omitted); and more recently they have acknowledged that burden. *See* Tr. (9/2/98) at 23. Having found at least implicitly that the Counties acted in good faith, Judge Port "calculated the fair rent-

al value of the land as *un* improved[,]" thus giving the Counties the benefit of a set-off for "several improvements" which they "erected or completed" on the "Oneidas' land[.]" *See Oneida IV,* 719 F.2d at 541 (emphasis added). Upon revisiting the good faith issue, if this court finds that Madison County did act in good faith, then it also must necessarily find that Judge Port properly valued the Park and radio tower lands, which are located in that County. If, on the other hand, this court finds that Madison County did not act in good faith, then it would not be entitled to a set-off for the improvements erected on that remaining property. Conversely, the Oneidas would be entitled to recover the value of that property as improved.

### A. Occupier v. Improver

Before delving into the issue of the proper legal standard to be applied in determining Madison County's good faith status, it is necessary to ascertain the scope of this inquiry. The County maintains that the court should examine whether it *occupied* the subject property in good faith, whereas the Oneidas urge the court to focus on whether the County *improved* that property in good faith. For the reasons set forth below, the court believes that it is necessary to examine the County's claimed good faith *both* in terms of its occupancy *and* improvements.

The Oneidas are reading *Oneida IV* as holding "that a set-off representing the value of improvement is appropriate, if Defendants had indeed *improved* the subject lands in good faith." *See* Pl. Memo. at 3 (emphasis added). That reading ignores the plain language of *Oneida IV,* however, where, in analyzing the issue of the propriety of allowing set-offs for improvements, the Second Circuit uniformly referred to "good faith *occupier[s]*" of the subject land. *See Oneida IV,* 719 F.2d at 541 and

542 (emphasis added). No mention is made therein as to whether the Counties also must show that they erected the improvements in good faith.

 Because the present case is on remand from the Second Circuit, which emphasized the issue of whether the Counties were "good faith occupiers," at least initially this court also will focus upon that discrete issue. It is logical to analyze good faith in this way because if Madison County did not occupy the land in good faith, it would be extremely difficult if not impossible to argue that any improvements were made in good faith. By the same token, even if the court finds that Madison County was a good faith occupier of the Park and radio tower properties, that does not end the good faith inquiry herein. The court must continue its good faith analysis because if a good faith occupant subsequently improves the property, that occupant will not be entitled to a set-off for improvements if the occupant had notice of an adverse claim. *Cf. Green v. Biddle,* 21 U.S. at 79 (good faith occupant of land, who by law is exempt from an accounting for rents and profits "cannot . . . maintain" that status "after the occupant has notice of an adverse claim[ ]"). Therefore, this court will address whether Madison County occupied the subject property in good faith, which encompasses its claimed good faith *vis-a-vis* improvements made to the Park and radio tower lands.

### 1. Legal Standard

The parties disagree as to the test to be applied in determining whether Madison County acted in good faith. As will soon become evident, however, the disparity between the parties' proposed standards for determining good faith is not nearly as great as it might appear at first glance. According to the Counties, the court should focus upon whether they "honestly

believed they owned the subject properties." [5] *See* Def. Memo. at 3 (citation omitted). From the case law, the Counties distill two factors which they deem particularly significant in resolving that issue: (i) a finding that the occupant "entered into possession of the land under 'color of title' and (ii) while in possession of the land, [the occupant] acted as if he owned the land." *Id.* (citing, *inter alia, Wright v. Mattison,* 18 How. 50, 59 U.S. 50, 56, 15 L.Ed. 280 (1855)). The Counties argue that the record as presently constituted clearly establishes both of these factors.

The Oneidas assert that a determination of good faith involves a "two-tiered inquiry[,]" but they frame that inquiry differently than do the Counties. *See* Pl. Memo. at 7. The first level requires an examination "into the *actual* state of mind of the occupier to determine his knowledge of the competing title claim[.]" *Id.* (citation omitted) (emphasis added). The second level, according to the Oneidas, involves an examination "into surrounding circumstances to determine whether the occupier's ignorance of the competing claim to title or belief in the superiority of his own claim is reasonable." *Id.* (citation omitted). The Oneidas read the relevant case law as "*requir[ing]*" this two-tiered inquiry, while at the same time they soundly reason that the first prong—the actual state of mind inquiry—is not easily adaptable to the present case because "[t]he Counties have not identified those county officials who participated in the acquisition or improvement of the subject land[.]" *Id.* at 11.

What is more, as the Oneidas rightly note, even if those officials were known, given the passage of time, "it is unlikely that th[ey] . . ., would be available to testify." *Id.* Furthermore, to the extent the state of mind of municipal defendants such as the Counties could be ascertained, most likely it would be done through official documents and actions taken by County officials. Here, "there are no . . . official documents or actions by the Counties expressing an institutional state of mind regarding the defect in title." *Id.* at 11, n. 7. Thus, as the Oneidas readily concede and the court agrees, "[g]iven the circumstances of this case, the actual state of mind inquiry is *not* helpful." *Id.* at 11 (emphasis added).

On the other hand, the issue of "whether a reasonable belief in the superiority of the improver's title can be inferred from the circumstances[,]" the Oneidas believe, "suits this case well." *Id.* The Oneidas offer three reasons for adopting what they term "this more objective standard of good faith[.]" *See id.* at 12. It has the practical advantage of "allow[ing] the parties to rely upon evidence that is reasonably available[.]" *Id.* Second, the reasonableness approach "allows for a more consistent result as applied to a claim area that extends beyond a single defendant and that defendant's state of mind." *Id.* Third, and from the Oneidas' perspective "[m]ost importantly," this approach "serves the protective purposes of the Nonintercourse Act by insuring that wilfully ignorant defendants cannot profit from illegal dealing in Indian land." *Id.* at 11–12 (citation omitted).

The court agrees that the Oneidas so-called "second tier" element is relevant to a finding of good faith here, *see id.* at 12; but it is not the only or the dispositive factor. Rather, as the Oneidas themselves recognize, courts also look at other factors to determine a party's good faith, such as color of title, and the "date of any notice of the competing claim, whether actual or

---

**5.** Honest belief is an alternative way of stating good faith. *See Searl v. School–Dist. No. 2,* 133 U.S. 553, 563, 10 S.Ct. 374, 377, 33 L.Ed. 740 (1890).

inferred from circumstances, in relation to the date of the improvement." *See* Pl. Memo. at 7 and 8. Nonintercourse land claims such as the present one are factually unique and raise a host of equitable concerns on both sides of the equation. Therefore, in this court's opinion, resolution of the good faith issue demands flexibility not rigidity in applying the relevant legal principles. Consequently, this court will look at an amalgamation of the factors suggested by the Oneidas and the Counties to decide the good faith issue herein.

### a. Color of Title

The first factor which the court will consider is whether Madison County entered possession of the Park and radio tower property under color of title. Relying upon the circumstances surrounding the original 1795 treaty between the Oneidas and the State of New York, as well as the deeds purporting to convey those lands, the Counties maintain that not only did they enter possession of that property under "color of title," but they entered "under *strong* color of title[.]" *See* Def. Memo. at 5 (emphasis added). There is no need to become sidetracked on the issue of whether the Counties' color of title was strong or weak because the Supreme Court has explicitly recognized: "Nor is it all important, whether the title be weak or strong[.]"[6] *See Wright,* 59 U.S. at 58. Initially, all that Madison County must show is that it acquired the Park and radio tower properties under color of title.

The Oneidas agree that color of title is a consideration, but they disagree with the Counties as to the significance to be accorded this factor. Essentially the Oneidas contend that the Counties are placing too much weight on this factor. The Oneidas read the Counties' color of title argument as an either/or proposition: "without it, an occupier cannot be in good faith, but with it an occupier is in good faith as a matter of law." Pl. Memo. at 7 (citation omitted). The court does not read the Counties' argument so narrowly. Indeed, to do so would contradict "the rule that *color of title* is [a] *matter of law*,[7] but *good faith* in the party claiming under such color is purely a *question of fact* [.]" *See Searl,* 133 U.S. at 563, 10 S.Ct. at 377 (citing *Wright,* 59 U.S. 50) (emphasis and footnote added). There is some interplay though between color of title and good faith. As the Supreme Court reiterated in *Searl:*

> [W]hile defects in the title might not be urged against it as destroying color, they might have an important and legitimate influence in showing a want of confidence and good faith in the mind of the vendee, if they were known to him, and he therefore believed the title to be fraudulent and void.

*Id.* at 562, 10 S.Ct. at 377.

In any event, to determine whether the Counties entered possession of the Park and radio tower lands under "color of title," it is necessary to ascertain the meaning of that phrase. In *Wright* the Supreme Court, noted that "courts have concurred, ..., without an exception, in

---

**6.** As a statutory adverse possession case, plainly *Wright* is factually distinguishable from this land claim action. There is no discernible difference though between color of title for purposes of an adverse possession statute and color of title as employed herein. Moreover, given the paucity of case law directly on point this court, as did the parties, is forced to resort to the most closely analogous cases such as *Wright*.

**7.** *See also Van Gunden v. Virginia Coal & Iron Co.,* 52 F. 838, 853 (4th Cir.1892) (Color of title "is [a] matter of law, and when the facts are shown, it is for the court to determine whether they amount to color of title.").

defining 'color of title' to be that which in appearance is title, but which in reality is no title." *Wright,* 59 U.S. at 56. Elaborating upon that terse definition, the *Wright* Court further explained that courts "have equally concurred in attaching no exclusive or peculiar character or importance to the ground of the invalidity of an apparent or colorable title; the *inquiry* with them has been, *whether* there was an *apparent or colorable title,* under which an entry ... has been made in good faith." *Id.* (emphasis added). Thus, for example, one court has described color of title as "anything in writing purporting to convey title to the land which defines the extent of the claim, it being immaterial how defective or imperfect the writing may be, so that it is a sign, semblance, or color of title." *Van Gunden,* 52 F. at 853 (internal quotation marks and citation omitted). In other words, "[c]olor of title is an apparent, but legally insufficient title." *In re Levinson,* 297 F. 490, 493 (W.D.Wash.), *aff'd on other grounds,* 1 F.2d 851 (9th Cir.1924).

To establish color of title, the Counties are relying upon both the circumstances of the original 1795 treaty between the Oneidas and the State of New York, as well as the deeds of conveyance for the Park and radio tower properties. There is no need to consider that 1795 transaction yet again, however. In fact, the Oneidas themselves question the relevancy of that transaction given the fact that it occurred well over 100 years before the Counties acquired the foregoing properties. *See* Pl. Memo. at 13, n. 8. As unlikely as it seems, the Oneidas and the Counties seem to agree on this one discrete point: "[T]he only relevant inquiry is whether the circumstances existing *at the time the Counties entered into possession of the subject properties* would have

indicated to the Counties that they were receiving good title." Def. Reply at 8 (emphasis in original). However, even if the court were to consider the 1795 treaty in connection with the Counties' color of title argument, it concurs with the Oneidas that the same supports a finding of color of title herein. *See* Pl. Memo. at 8, n. 4 ("Because of the nature of the Iroquois land claims—claims to land acquired by the State in violation of federal law and immediately resold to non-Indian settlers—virtually every defendant in these cases [including the Counties herein] occupies under color of title[.]")

Even in the face of that seeming concession, the Oneidas insist on challenging the Counties'[8] color of title. *See id.* at 15; 18–20. Thus, because Madison County also is relying upon the deeds to show that they acquired the Park and the radio tower properties under color of title, it is necessary to consider the impact of those deeds upon that County's color of title argument. The court agrees with the Oneidas that "the deeds alone are insufficient to demonstrate good faith[;]" *see id.* at 15, but it disagrees that because the court did not consider those deeds in deciding liability, it should not give any effect to those deeds in fashioning a remedy. *See id.* at 15, n. 10.

Likewise, the court does not believe, as the Oneidas urge, that to give effect to those "illegal deeds" would run afoul of this court's obligation to fashion a federal common law remedy consistent with the purposes of the Nonintercourse Act. *See id.* Consideration of the deeds is entirely appropriate at this juncture because they go to the overriding issue of good faith, which Judge Port impliedly recognized and the Second Circuit agreed, is relevant in formulating the remedy in this case. *See* Pl. exh. 1 at 166a—167a; and *Oneida IV,*

---

**8.** As will quickly become evident, however, it is only Madison County's good faith which is called into question under the facts as they have developed on remand.

719 F.2d at 541. Moreover, disallowing the deeds would render the color of title inquiry practically meaningless because that is the bulk of the proof herein as to the circumstances under which Madison County acquired the Park in 1930, and the radio tower property in 1953 and 1961.

### i. Champlain Battleground Park

The record demonstrates that Madison County acquired this Park land by a deed date and recorded on July 21, 1930. *See* Def. exh. M.[9] In that deed Andrew and Gussie Roberts conveyed to the County the property which came to be known as the Champlain Battleground Park. That deed further indicates that the property conveyed therein was "a portion of the same premises conveyed to the [Roberts] ... by Adam ... and Mary Buyea[.]" *Id.* Among other things, that deed also provided "[t]hat ... [the] Roberts will *forever warrant* the *title* to said premises[,]" and that they "grant[ed] and release[d] unto [Madison County], its representatives and assigns forever[,]" the property described therein. *See id.* (emphasis added). In light of the foregoing, the Counties argue that "an examination of the face of the deed under which ... Madison [County] entered possession of ... [the] Park could reasonably lead the County ... to believe that the deed conveyed good title to the property." Def. Memo. at 12 (citation omitted).

Certainly on its face the language of this deed grants title of the Park property to Madison County. Thus, because apparent title is all that is required to show color of title, the court finds as a matter of law that Madison County did acquire this property under color of title. As noted earlier, however, in the court's opinion, color of title standing alone is insufficient to establish good faith, which is a multi-faceted inquiry. Hence, the court will consider the impact on the good faith issue of the circumstances surrounding Madison County's acquisition of the Park land.

In response to Madison County's assertion that it acquired the Park land under color of title, the Oneidas contend that "[t]he circumstances surrounding this *acquisition* prove that ... Madison County had *actual knowledge* of the Oneidas' *prior possession* of the site, ... thus rebut[ing][the][C]ounty's claimed good faith." Pl. Memo. at 18 (emphasis added).[10] Indeed, the Oneidas go so far as to claim that the circumstances surrounding acquisition of the Park actually "support" an inference of bad faith. *See* Pl. Memo. at 15. As set forth below, the record evidence as to the County's acquisition of the Park land reveals that despite the Oneidas' assertion to the contrary, although the County may have been aware of an historic battle on this site by the Oneidas some 300 years prior to the Counties' acquisition of same, it did *not* have actual knowledge of the Oneidas' prior possession of the site.

A 1936 Madison County Resolution appointing a caretaker for the Park notes the historic significance of that land insofar as the Oneidas are concerned. *See* Def. Reply Memo., exh. 8 thereto. That Resolution also explicitly recognized the "poten-

---

**9.** In accordance with Fed.R.Evid. 201, the court hereby grants the Counties' request to take judicial notice of the relevant certified deeds, which now are part of the record herein. *See* Def. exhs. M, N. and O. Similarly, the court hereby grants the Oneidas' request to take judicial notice of various Madison County Resolutions which will be discussed above.

**10.** This argument is illustrative of the interplay between the various good faith factors identified by the parties herein.

tial value to the County and its citizens" of that "archaeological and historical site[.]" *Id.* Consistent with the County's apparent understanding of the historical significance of the Park, during the damages hearing there was proof that the State placed a historical maker at the Park explaining that during the Champlain Battle, "SAMUEL deCHAMPLAIN AIDED BY 10 FRENCHMEN AND 300 HURONS ATTACKED THE STOCKADED ONEIDA INDIAN VILLAGE, OCTOBER 10–16, 1615." Pl. Memo. at 19 (quoting Pl. exh. 62 at 52). In light of the foregoing, the Oneidas urge that the Park deed and other "[C]ounty records authorizing the acquisition [of the Park,] support an inference that … Madison County had actual knowledge of prior Oneida possession of the land[,]" which, "[a]t a minimum, … created an obligation on [the] County's part to investigate its claim to title." *Id.* Because the County did not conduct any such investigation, the Oneidas argue that it did not acquire and improve the property in good faith.

To be sure, the evidence, and more particularly the 1936 County Resolution, tends to support a finding that six years after acquiring the Park, the County was aware of the fact that there had been a battle of historical significance on this site between the Oneidas and the Hurons. The record does *not*, however, "support a finding that the County had actual knowledge of the Oneidas' prior possession" of this land. *See* Pl. Memo. at 18. Furthermore, even if the record supports a finding that Madison County had such knowledge, it does not necessarily follow that the County should have concluded, when it purchased the Park in 1930 from the Roberts, who are identified in County Resolutions as the "landowners" and as "owners of [the] premises," that because the Oneidas had been on that property over 300 years earlier, the Oneidas continued to hold title to

that property in 1930. *See* Pl. Memo. exh. 3 thereto at 18 and 94. It strains credulity to argue that Madison County should have made such an inferential leap.

■ What is more, the resolution authorizing purchase of the Park only did so provided that the County received "abstracts of title showing the premises purchased to have a *marketable* title[.]" *Id.* at 94–95 (emphasis added). Given the County's purchase of that property, presumably it was satisfied that the Roberts held marketable title to same. Lastly to the extent Madison County may have had any obligation, as the Oneidas suggest, to investigate its title to the Park land, the current record easily supports an inference that the County satisfied that obligation by demanding and obtaining title abstracts showing that the immediate grantors had marketable title to the same. *See id.* Especially because the Park deed appeared valid on its face, any obligation which Madison County may have had to trace title (an obligation which the court finds highly doubtful), certainly would not have required that County to trace the title back 300 years. In short, there is nothing in the circumstances surrounding Madison County's acquisition of the Park which (1) defeats its color of title claim to that property; or (2) which undermines a finding of good faith in connection therewith, much less that would, as the Oneidas urge, support a finding of bad faith.

### ii. Radio Tower

Also relying upon the face of the deeds which conveyed the 2.07 acres upon which the fire department radio tower sits, Madison County asserts that they entered into this "property under strong color of title." Def. Memo. at 12. By a September 1953 deed and a second deed dated January 16, 1961, and recorded January 19, 1961, Ed-

ward and Blanche Judd conveyed this property, in the first deed, to the "Madison County Volunteer Firemens Association, Inc. of Madison County, New York" ("the Association"), and in the second deed, simply to "The County of Madison[.]" Def. exh. N. The 1953 deed conveys the property described therein to the Association "its heirs and assigns *forever* [.]" *Id.* (emphasis added). Likewise, the 1961 deed purports to convey to Madison County a right of way described therein, and in that deed the Judds "remise[d], release[d] and *forever* quitclaim[ed]" to the County "its successors and assigns" such right of way. *See id.* (emphasis added).

■ As with the 1930 Park deed, clearly the unequivocal language of these two deeds shows that Madison County acquired this property under color of title. In fact, in contrast to the Park land, the Oneidas do not challenge Madison County's color of title with respect to the radio tower property by arguing that the circumstances surrounding the acquisition of this property support an inference of bad faith. Accordingly, the court finds as a matter of law that Madison County also acquired this property under color of title.

### b. Acts of Ownership

Having found that Madison County acquired both the Park and the radio tower properties under color of title, the court will turn to the issue of whether, after "entering possession of the subject properties, the Counties ... acted as if they owned" same. *See* Def. Memo. at 13. Initially, Madison County's only proof in this regard was the testimony of Donald Callahan, supervisor and chairperson of that County's Board of Supervisors, essentially the County's chief executive officer. *See* Def. exh. P. at 513–14. When he testified in 1981, Mr. Callahan had held that position since January, 1980; he explained that

his duties were primarily legislative, appropriations and finance. *See id.* Prior to that, Mr. Callahan had served as a town supervisor since July 19, 1978. *See id.* at 518. Mr. Callahan's testimony as to acts of ownership was extremely brief. When asked whether Madison County incurred "maintenance" expenses as to the Park, Mr. Callahan tersely replied, "Yes, on an annual basis." *Id.* at 516. He provided the same answer when asked whether Madison County "incurred expenses for the maintenance and ... operation" of the radio station property, adding that "is one of the more expensive bits of [annual] maintenance[.]" *See id.* at 516 and 519.

■ The Oneidas maintain that the foregoing is insufficient to carry Madison County's burden on this element because these claimed acts of ownership are only in fairly recent years—in Mr. Callahan's case, only from July 19, 1978 onward, at most. While that is true, Madison County has supplemented the record showing that it exercised acts of ownership over these two properties well before 1978; and the Oneidas do not challenge this proof. Significantly, in 1936 approximately six years after acquiring the Park, the Madison County Board of Supervisors appointed a caretaker for that property. *See* Def. Reply Memo., exh. 8 thereto. In the Resolution appointing that caretaker, it recited that the Park land is an "historic site of a battle which occurred between Oneida Indians and a force of French and Huron Indians led by Samuel de Champlain in October, 1615." *Id.* Appointment of a caretaker arose out of concerns that because it "is an archaeological and historical site of great potential value to the County and its citizens[,]" the Park land would be "exposed to the danger of irreparable damage" by "vandals and curio hunters[.]" *See id.* That Resolution also authorized yearly compensation for the caretaker, as

well as authorizing the expenditure of County funds for "necessary [yearly] expenses[.]" *Id.* Finally, in that Resolution the caretaker was deputized by the County Sheriff, to "giv[e] [the caretaker] all of the usual powers of a peace officer for maintaining order and preventing destruction and despoliation of [the Park.]" *Id.*

In subsequent years, Madison County continued to appoint a caretaker and to authorize funds "for maintenance and improvement" of the Park. *See id.,* exh. 9 thereto. For instance, in 1959, the caretaker's yearly compensation was doubled. *See id.* Madison County Resolutions providing for a Park caretaker continued through 1970. *See id.* An additional act of ownership which Madison County notes is the fact that in 1954, its Board of Supervisors "grant[ed] permission for erection of [a] dam" on the Park property. *See id.,* exh. 10 thereto at 65.

Similarly, Madison County claims to have exercised acts of ownership over the radio tower property. In 1953 that County authorized funds to install a fire service radio. *See id.,* exh. 11 thereto at 14–15. Also in 1953, Madison County authorized the expenditure of $1,950.00 in County funds to purchase radio tower equipment. *See id.* at 45. As further evidence of acts of ownership, Madison County points to the fact that it awarded contracts in connection with that property, including one with the New York State Department of Public works. *See id.* at 105.

Based upon the foregoing, in combination with the fact that the court has found that Madison County acquired these properties under color of title, and that that County asserts that it has established the good faith necessary to entitle it to a set-off for improvements to these two properties. *See* Def. Memo at 16; and Def. Reply at 14. The foregoing convinces the court that Madison County both had color of title to the Park and radio tower land, and that it exercised acts of ownership over that property. As previously discussed, however, color of title and acts of ownership, in this court's view, do not necessarily establish good faith. Thus, the court will go on to consider the Madison County's good faith *vis-à-vis* the improvements to these properties.

### c. Improvements

There is one preliminary issue with respect to the improvements and that is when good faith must be shown in relation thereto. The Oneidas assert that a "good faith improver must establish that status as of the date the improvements were erected." *See* Pl. Memo. at 27. In contrast, the Counties maintain that they need not demonstrate the precise dates on which the improvements were erected, and in fact those dates are "irrelevant" because the Counties entered the property under color of title and "thereafter continued to possess the properties in good faith[.]" *See* Def. Reply at 14, n. 21. It is possible, as the Oneidas point out and as mentioned earlier, for a good faith occupier to lose that status with notice of an adverse claim. *See Green v. Biddle,* 21 U.S. at 79. Despite the Oneidas' suggestion to the contrary, however, there is nothing in that case holding that a good faith occupier has the burden of proving the exact dates when the improvements were made. Consequently, the court will not require the Counties to prove the same, but it will examine their purported ongoing good faith from the time of acquisition.

### i. Notice of Competing Claims

The Oneidas offer several reasons as to why, even if the Counties are deemed good faith occupiers, they did not retain that status through the years. First, the Oneidas assert that "[t]he absence of formal

notice in county records of the [their] claim, standing along, cannot establish the Counties' good faith." Pl. Memo. at 21. Second, the Oneidas assert that "the[ir] multiple and fruitless efforts to obtain redress for their claims[ ]" does not support a finding of good faith on the part of the Counties because those efforts "rais[ed][a] reasonable doubt" as to the Counties' title. *See id.* at 21 and 22 (citation and footnote omitted). Third, the Counties' assertion of the absence of fraud cannot, in the Oneidas' view, justify a finding of good faith here by the Counties because "fraud is not a necessary element of bad faith." *Id.* at 23 (citations and footnotes omitted). None of these arguments are persuasive, and do nothing to alter the court's view that Madison County did not lose its good faith status from the time it acquired the Park and radio tower properties up through 1969.

The County retorts that not only does the present record show they acted in good faith both in acquiring and improving the subject properties, but the "record is devoid of any evidence which would impeach that good faith." Def. Memo. at 16. For example, Madison County explains that the record establishes that it had no notice of the Oneidas' adverse claim to the Park and radio tower lands until 1970 when the Oneidas commenced this action. In that regard, Mr. Townsend, an Oneida County official for approximately seven years in the 1960s and, at the time of the damage hearing in 1981, a resident of that County for 58 years, testified that "[t]o the best of [his] knowledge[,]" at no time prior to the filing of this lawsuit in 1970 "was any notice given to the [C]ounty of any adverse claims to the [C]ounty land by the Oneida Indian Nation[.]" Def. Memo., exh. T thereto at 471 and 472. Mr. Callahan, a Madison County official similarly testified that until the filing of this lawsuit in 1970, he did not have any knowledge, either personally or in his official capacity, or from any other source, that that County did not own the Park and radio tower properties. *See id.,* exh. P thereto at 517.

Furthermore, in response to the Counties' Request for Admissions, when asked to admit that they "had been aware, since well prior to 1951, of the Counties' use of the subject properties[,]" Def. Memo. at 17, the Oneidas denied same. *Id.,* exh. S thereto. Not only that, the Oneidas went on to admit that although they were "generally aware that Oneida Territory was occupied by adverse claimants, *but* [they] *w[ere] not aware of the identity of the claimants* or the specifics of the claimants' use." *Id.* (emphasis added). In light of the foregoing, the court finds persuasive the Counties' reasoning that "[i]t is inconceivable how [the Oneidas] could have ever notified the Counties that [their] claimed superior title to the subject properties when [the Oneidas,] according to their own admission, did not even know who was using or occupying the subject properties." Def. Memo. at 18.

The court also is not swayed by the Oneidas' argument that they had no obligation to notify individual trespassers, such as the Counties, because the Oneidas' had ongoing relationship with the federal and state governments, but not the County governments. Any knowledge of the Oneidas' claims which the federal and state governments may have had is simply irrelevant to the Counties' good faith status because, as the Counties are quick to point out, the Oneidas are seeking to hold them liable for monetary damages herein. The Oneidas are not seeking to hold the other governmental agencies liable for such damages in this particular test case.

■ The court does agree with the Oneidas, however, that "[t]he absence of formal notice in county records of the[ir]

... claim, *standing alone,* cannot establish the Counties' good faith." *See* Pl. Memo. at 21 (emphasis added) (footnote omitted). As should be readily apparent by now, there is far more in the record showing the Counties' good faith than the mere absence of notice. That lack of notice, taken together with the Oneidas' admission in this regard, recited above, along with the fact that plainly the Counties acquired this property under color of title and acted as owners of the same, *all* contribute to this court's finding that the Counties have met their burden of establishing good faith in connection with the Park and radio tower lands.

Even assuming *arguendo* that the Counties had actual knowledge of the Oneidas' adverse claim, such notice does not undermine a finding of good faith. That is so because it was not until 1974 at the earliest, when in *Oneida II* the Supreme Court held that federal courts have jurisdiction over these land claims, that entities such as these Counties might have become aware of the viability of this land claim. There is ample evidence in the record demonstrating that until 1974 the Oneidas' attempts to reclaim their homeland had been largely unsuccessful. Certainly given the novelty of land claims such as this, it is only with the advantage of hindsight that now, in the year 2002, an argument could be made that Madison County officials in 1930, 1953 and/or 1961 should have been aware that such centuries' old claims were legally viable, let alone that subsequent occupiers of that property could be held liable to the Oneidas for monetary damages.

There are several other factors, all pertaining to notice, which the Oneidas mention in an attempt to challenge the Counties' asserted good faith status. None of these other factors require a different result here, however. First, the Oneidas place a great deal of credence in *United States v. Boylan,* 265 F. 165 (2d Cir.1920). *Boylan* does not, however, support the Oneidas' view that their claims to the subject properties were meritorious, and hence the Counties should have been put on notice of same through that 1920 litigation. *Boylan* is distinguishable in several significant respects. First of all, it involved an 1842 treaty, not the 1795 treaty, which is the basis for the claims herein. Second, the issue in *Boylan* was whether an Oneida could mortgage his interest in the Oneida reservation created by the 1842 treaty, to an outsider, without the consent of the United States and without complying with State law. The Second Circuit held that such a transaction was invalid; and what is more, that holding does nothing to advance the Oneidas' claims herein. Thus, the court finds misplaced the Oneida's reliance upon *Boylan* to establish notice in this particular case.

The court has examined the Oneidas' remaining arguments; that is that the Counties should have had notice based upon 25 U.S.C. § 233, a jurisdictional statute, and from newspaper articles, which would somehow discredit the Counties' good faith. For the reasons set forth by the defendants, the court finds neither of these arguments convincing. *See* Def. Reply at 17–19.

### IV. Estoppel

Because the court has found that Madison County did act in good faith with respect to the occupation of and improvements on Champlain Battleground Park and the radio tower property, there is no need to address its final argument which is that the Oneidas are estopped from claiming that Madison County is not entitled to a set-off for improvements on that property.

### Conclusion

In conclusion, given that this court is bound, as was Judge Port, in its ability to "refashion[ ] what appears to be existing law by reason of contemporary times or conditions[,]" *see* Pl. exh. 1 at 164a, it is compelled to find that the Counties did act in good faith and thus, Judge Port properly concluded that they were entitled to a set-off for improvements on the subject property, as discussed above. Several factors are particularly significant to this court's holding, including the fact that there is absolutely nothing in the record showing that these Counties were, at most, anything other than "non-active wrongdoers[.]" *See Oneida IV,* 719 F.2d at 541. Furthermore, as the foregoing discussion demonstrates, insofar as the Park and radio tower properties are concerned, clearly this was a case of mistaken belief in ownership, with no indication of fraud on the Counties' part. Finally, the purposes of the Nonintercourse Act are served by finding that the Counties acted in good faith herein because this is not a case where "wilfully ignorant defendants ... profit[ed] from illegal dealing in Indian land." *See* Pl. Memo. at 11–12 (citation omitted).

For the reasons set forth herein, the court hereby finds, as did Judge Port, that the Oneidas are entitled to recover from Oneida County a total of $15,994.00, which represents $8,360.00 for the full fair market rental value of that portion of the subject property located in the County and used as highways during 1968 and 1969, plus $7,634.00 for Oneida County's unlawful occupancy of the gravel pit. The court further finds, as Judge Port held, that the Oneidas are entitled to recover from Madison County a total of $18,970.00, which represents $9,910.00 for the full fair market rental value of that portion of the subject property located in Madison County and used as highways during 1968 and 1969, plus $9,060.00 for Madison County's unlawful occupancy of the Park and radio tower lands. *See* Pl. exh. 1 at 172a and 173a.

The Clerk of the Court is hereby ordered to enter judgment in accordance herewith, including calculation of prejudgment interest, as set forth below.[11]

IT IS SO ORDERED.

---

**11.** The court agrees with the Oneidas that "[i]n calculating interest, the interest rate should be increased from 6% to 9% as of June 25, 1981." Judge Port relied upon the interest rate applied in New York State and that rate changed effective June 25, 1981. *See* Exhibit 1; *see also* N.Y.C.P.L.R. 5004 note, 1981 Amendments. The court disagrees, however, that prejudgment interest should be calculated at a rate of 6% per annum "from January 1, 1968 through December 31, 1981, and at a rate of 9% per annum for each year thereafter." *See* Pl. Memo. at 29, n. 18. Rather, in calculating the prejudgment interest herein, such calculations should begin with the filing of the complaint on February 5, 1970. *See, e.g., Cyberchron Corp. v. Callldata Systems Development, Inc.,* 47 F.3d 39, 43 (2d Cir.1995) (district court allowed prejudgment interest from date of commencement of litigation); and *Conway v. Icahn & Co., Inc.,* 16 F.3d 504 (2d Cir.1994) (district court did not abuse its discretion in awarding prejudgment interest from commencement date of action). The interest rates should change, however, in accordance with the state statute just mentioned.